STATE OF NORTH CAROLINA v. KARL DeGREGORY

No. 4

(Filed 10 April 1974)

1. **Homicide § 18— premeditation and deliberation — proof by circumstantial evidence**

    Premeditation and deliberation are not usually susceptible of direct proof and are therefore susceptible of proof by circumstances by which the facts sought to be proved may be inferred.

2. **Homicide § 18— premeditation and deliberation — circumstances to consider**

    Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are want of provocation on the part of the deceased, conduct of defendant before and after the killing, use of grossly excessive force or the dealing of lethal blows after deceased has been felled.

3. **Homicide § 21— premeditation and deliberation — sufficiency of circumstantial evidence**

    Where the evidence tended to show that defendant shot one victim twice and the other victim three times, that both victims died as a result of shots through the heart, and that severe head wounds which exposed the skull were inflicted upon both victims before the shots were fired, the ingredients of premeditation and deliberation necessary in first degree murder could be inferred, and the trial court properly denied defendant's motion for nonsuit.

State v. DeGregory

4. **Criminal Law § 52— psychiatrist's opinion — personal examination as basis — admissibility**

In a first degree murder case the trial court did not err in allowing a psychiatrist to base his expert opinion as to the sanity of defendant upon both his own personal examination and other information contained in the patient's official hospital record, though that other information itself would have been inadmissible.

APPEAL by defendant from judgments of *Ervin, J.,* 23 July 1973 Schedule "A" Criminal Session, MECKLENBURG Superior Court.

Separate bills of indictment, proper in form, charging defendant with the murders of Clovis P. Powell and wife Mae Cochrell Powell on 2 March 1972, were consolidated for trial.

The State offered evidence tending to show that Clovis P. Powell and wife Mae Cochrell Powell resided in a one-story single family dwelling at 5201 Londonderry Road in Charlotte. At approximately 7 p.m. on 2 March 1972 James Kutcher, a neighbor, carried some bones to the Powell dwelling for their dog and delivered them to Karl DeGregory who answered the door. Clovis Powell was in the kitchen at the time and spoke to Mr. Kutcher.

William E. Oats and his wife Evelyn P. Oats, residents of Rock Hill, South Carolina, were shopping in Charlotte on 2 March 1972 and arrived at the Powell home about 9:45 p.m. for a visit. Mr. Powell was Mrs. Oats' father and Mrs. Powell was her stepmother. After parking their automobile in the rear of the Powell home and while standing outside the back door, they heard a noise "like a metal door slamming twice." Mrs. Oats checked the front door but no one answered. After several minutes Mrs. Oats returned to her car and Mr. Oats went to the Kutcher residence to phone the Powells. At that time defendant emerged from the back door of the Powell residence and told Mr. and Mrs. Oats he was a house guest of the Powells and that they were not at home but had gone out to dinner with some friends. Defendant's appearance and demeanor appeared normal and he behaved in a calm rational manner. After conversing with defendant for a few minutes, Mr. and Mrs. Oats left, noting at the time that both automobiles belonging to the Powells were parked at the back of the house.

At approximately 11:30 p.m. that evening, Worth Taylor Phillips, a highway patrolman stationed in Lexington, North

Carolina, pursued and stopped a green Oldsmobile driving north on I-85 near Lexington at an excessive rate of speed. Defendant Karl DeGregory, operator of the vehicle, told the patrolman it belonged to Mr. Powell and that he and Mr. Powell were thinking about going into business together. The defendant acted normal at that time.

At about 10:30 p.m. on 2 March 1972, one hour before he was stopped by Patrolman Phillips, defendant telephoned a man named Raymond Mileski who lived at 1214 Greensboro Road, High Point, North Carolina, and advised Mr. Mileski that he was calling from a phone booth near the airport. As a result of the phone conversation, defendant arrived at the Mileski home in High Point about 12:20 a.m. on 3 March 1972. Defendant and Mileski were old friends and after a general conversation about tax matters and other problems, they retired for the night. About 6 a.m. Mr. Mileski loaned defendant $40.00 for a plane ticket to return to defendant's home in Florida, and he left the Mileski home about 6:15 a.m.

When Mrs. Powell failed to report for work on the morning of March 3, a co-worker drove to the Powell residence to ascertain the reason. She observed a windowpane broken in the back door, opened the door, found the dog crying, ashes and cigarette butts on the floor, the lights on, the morning paper still on the porch, the television blaring, Mrs. Powell's glasses on the floor and her purse overturned. She became frightened, sought help at the Kutcher house nearby, and called the police.

The police found Mr. Powell's body lying in the hall and Mrs. Powell's body in a sitting position between the commode and the bathtub in one of the bathrooms. Mr. Powell's rear pockets were turned inside out. He was lying in a pool of blood. Mrs. Powell had blood on her face and a bloody towel on top of her head. A piece of the bathroom door lock was lying on the bathroom floor and the door facing was splintered. Several dresser drawers and chest drawers in the home were pulled out and several spent .380 cartridge casings were found near the bodies. Blood was on one of the beds and blood drippings were found in the hallway. On the kitchen table was a note in defendant's handwriting reading as follows: "Mr. Powell, Mr. Oats was by to see you. I told him you and Mae were going out. Karl. P. S. Will call on Saturday."

Dr. Hobart R. Wood, the Medical Examiner for Mecklenburg County, performed an autopsy on the body of Clovis Powell.

He found three gunshot entry wounds, two exit wounds and one bullet embedded under the skin. One bullet had entered the right temporal area and exited through the left upper cheek. A second bullet had passed through the heart while the third bullet entered at the lower left chest below the rib cage, passed through the abdominal cavity and was found embedded in the tissue of the muscles of the lower right back. This bullet was recovered. There were, in addition, extensive head injuries involving a series of five deep lacerations leaving the skull bare. Based on the autopsy, Dr. Wood was of the opinion that the head wounds were inflicted by a blunt instrument before the gunshot wounds and that the bullet wound through the heart was the immediate cause of death.

The autopsy on Mrs. Powell revealed two entry and two exit gunshot wounds, one bullet entering the left upper chest area and the other entering the left upper quadrant of the abdomen below the rib cage. One bullet remained in the clothing and was recovered. The stone in the setting of a ring on Mrs. Powell's third finger right hand was missing. Mrs. Powell also had two deep scalp lacerations, one in the parietal area near the midline of the head and the other in the back of the head in the right occipital area. These wounds were very deep. In Dr. Wood's opinion, Mrs. Powell died of the gunshot wound in the chest.

On 9 January 1971, Karl DeGregory, who lived in Ormond Beach, Florida, purchased from Richard J. Buchwald, a gun shop owner in Daytona Beach, Florida, a Browning .380 automatic pistol, serial number 535188, and four boxes of Remington Peters .380 ACP cartridges. A record of this transaction was kept by Mr. Buchwald as required by law and was offered in evidence. Mr. Buchwald testified: "State's Exhibit #13 is the exact gun I sold Karl DeGregory on January 9, 1971. The Serial Number on the gun is 535188. It is the same type, style, brand, caliber and serial number."

On 13 March 1972 Sergeant William A. Shaw, Jr., Detective Holmberg and Detective Travis, all with the Mecklenburg County Police Department, went to the home of Ray Mileski in High Point and, with his permission, searched the house. There is a fireplace in the Mileski living room containing a trapdoor leading to an ash pit below. In the ash pit in the basement the following items were discovered: a pink washcloth, a set of keys marked "American Motors," a pair of green plastic gloves, a white handkerchief, a wooden handle, a Browning automatic and some torn

up Oldsmobile floor mats. These items were all offered in evidence. The Browning automatic pistol is State's Exhibit 13 which Mr. Buchwald sold to Karl DeGregory on 9 January 1971 in Daytona Beach, Florida. Dried blood taken from the front of State's Exhibit 13 was determined to be the same type as Mrs. Powell's blood. Blood taken from other portions of the pistol matched a blood type produced by a mixture of Mr. and Mrs. Powell's blood. The washcloth contained traces of human blood but in insufficient quantity to be typed. The handkerchief contained smears of human blood the same type as Mrs. Powell's blood. The pair of gloves contained traces of human blood Type O, the same as Mr. Powell's blood type.

An expert in the field of firearms identification examined the .380 automatic pistol, State's Exhibit 13, and the .380 caliber bullets recovered by Dr. Wood from Mr. Powell's body and Mrs. Powell's clothing. By test firing the pistol and making microscopic comparisons it was determined that the bullet removed from Mr. Powell's body and the bullet found in Mrs. Powell's clothing were both fired from the .380 Browning automatic pistol, State's Exhibit 13.

Defendant, testifying as a witness in his own behalf, said he was staying with Mr. and Mrs. Powell on 2 March 1972; that he was very close to them and they always treated him like a son; that he remembered Mrs. Powell coming home about 9:30; that State's Exhibit 13 was his gun and he remembered having it with him in the Powell home after 9:30 p.m. on March 2; that he remembered being in the bedroom changing clothes to go to New Jersey or to Florida to be with his wife and children; that he remembered Mrs. Powell coming into the bedroom, kissing him in an improper way and talking to him; that he remembered Mr. and Mrs. Oats coming to the door and going outside to talk with them but remembered nothing else of what occurred in the Powell home; and that he remembered being stopped for speeding by Officer Phillips and receiving a citation but did not remember putting the gun and other items in the ash pit in Mr. Mileski's home. He testified that he was arrested in Ormond Beach, Florida, on Saturday, 4 March 1972.

Defendant further testified that he had been employed by a chemical firm in High Point at an annual salary in excess of $10,000. His territory was between Virginia and Florida. He quit that job in February 1972. Prior thereto his annual salary was $18,500 plus expenses working for a Canadian firm. In

State v. DeGregory

March 1972 he owed Mr. Mileski approximately $5,000 and his financial picture was "borderline." His house rent in Florida was $300 per month and he was one month behind in rent. When arrested on 4 March 1972 he knew nothing about the circumstances of the murders in Charlotte and first became aware of them when so informed at the time of his arrest.

Defendant testified that on several occasions, after arguments with his wife, he would have lapses of memory and labor under the delusion that he had a twin brother named Michael; that on 29 November 1971 in Melrose, Florida, he became lost, stopped at a beauty shop to inquire about directions, saw two women partially undressed inside, remembered that he had a gun in his hand while in the beauty shop but did not remember hearing the gun go off, and remembered a sixteen-year-old girl being in his car after he left the beauty shop. He said "Michael" was with him on 21 February 1972 at Wildwood, Florida, when he stopped at a restaurant and observed a man and a woman leave the restaurant and enter an automobile. He remembered following this couple to a nearby cemetery and coming up to the vehicle and punching both occupants with a knife but didn't remember seeing any blood.

Deputy Sheriff Wayne Allen, Sergeant Investigator for the Volusia County Sheriff's Office, Deland, Florida, testifying for the defendant, said that three females were slain in Melrose, Florida, on 29 November 1971, and a male and a female were slain near Wildwood, Florida, on 21 February 1971; that Karl DeGregory had told him that he believed he was responsible for these killings, but that as a professional police officer he was not totally satisfied that the killings were done by Karl De-Gregory.

A number of other police officers from Florida also testified for the defendant, relating their investigations of the Melrose and Wildwood slayings, their interviews with defendant concerning these killings, and the fact that Karl DeGregory was not under indictment in Florida for either the Melrose or Wildwood killings although investigations concerning Karl DeGregory were still underway in Florida. Some of the information given by these police officers tended to show that Karl DeGregory had been told about the Florida slayings during a police interrogation on 9 March 1972 and that it was only after that date that he started talking about his involvement in the Melrose and Wildwood incidents. Other testimony was to the effect that

Karl DeGregory had information concerning the Wildwood slayings that would have been unavailable to him unless he had been there at the time of the slayings.

On recross examination, defendant identified his signature on a gas receipt from a service station in Winston-Salem showing the date 29 November 1971, the same date of the Melrose slayings. In the face of this receipt defendant insisted that on 29 November 1971 he was in Melrose, Florida, and implied that the date on the receipt was wrong.

Raymond Mileski, called by defendant as a witness, testified that he had conversed with defendant many times prior to 2 March 1972; that he visited defendant in jail in Florida on 11 March 1972; that based upon his long acquaintance with defendant he had learned that defendant thinks he has a twin brother named Michael; that Michael hated sex and was an avenger; and that defendant was convinced to a certainty that Michael, in fact, did exist. In the opinion of Mr. Mileski defendant did not have the capacity to distinguish between right and wrong on 2 March 1972.

Dr. Ann McMillan, a clinical psychologist with the Mental Health Guidance Center, Volusia County, Florida, testified she saw defendant on 6 March 1972 in the Volusia County Jail; that defendant was upset and disturbed; that she conducted thirty hours of testing and interviewing defendant and found him to be mentally ill, suffering from schizophrenia with paranoid tendencies. Based upon her examinations and evaluations of defendant, she found Michael to be a delusion, the actor-out of all things which the rigid, straight, and religious Karl would not accept. According to the professional opinion of Dr. McMillan, the defendant was legally insane and did not have the capacity to know right from wrong on 2 March 1972.

Dr. Robert Rollins, a medical expert specializing in the field of psychiatry, testified for the State as a rebuttal witness. His evidence tends to show that he is Superintendent of Dorothea Dix Hospital in Raleigh; that defendant Karl DeGregory was admitted under court order for observation and evaluation and spent approximately sixty days in the hospital. Based upon his own examination, Dr. Rollins testified that in his opinion the defendant was not a paranoid schizophrenic.

The prosecuting attorney posed the following question to Dr. Rollins: "Based upon your own personal examination and

interview of Karl DeGregory, and any other information contained in his official record of which you were the custodian and had available to you, did you make a diagnosis of the defendant?" Over objection, Dr. Rollins gave this answer: "For the purposes of our report back to the court, the psychiatric diagnosis was without psychosis; that is, not insane, that Mr. DeGregory was competent to stand trial."

Following instructions admittedly free from error, the cases were submitted to the jury upon defendant's plea of not guilty and not guilty by reason of insanity. The jury convicted defendant of murder in the first degree in both cases and he was sentenced to life imprisonment in each case. His appeal to this Court presents for initial appellate review the two assignments of error discussed in the opinion.

*W. Herbert Brown, Jr., Attorney for defendant appellant.*

*Robert Morgan, Attorney General; Rafford E. Jones, Assistant Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

At the close of all the evidence defendant moved for judgment of nonsuit in each case. His first assignment of error is based on denial of these motions. He contends the motions should have been allowed with respect to the charges of murder in the first degree because "no evidence was presented during the trial which related to the elements of premeditation and deliberation, either by direct proof or by any other inference or circumstance."

[1] "Premeditation and deliberation are not usually susceptible of direct proof, and are therefore susceptible of proof by circumstances by which the facts sought to be proved may be inferred." *State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484 (1969) ; *accord State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971) ; *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970).

[2] "Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled. *See State v. Walters* and cases cited, 275 N.C. 615, 623-24, 170 S.E. 2d 484, 490 (1969). *See also State v.*

*Johnson,* 278 N.C. 252, 179 S.E. 2d 429 (1971)." *State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539 (1973).

**[3]** Evidence offered by the State tends to show, *inter alia:* Mr. Powell died as a result of gunshot wounds—two in the chest with one bullet piercing the heart, and one in the head. Each bullet wound was potentially fatal and the temple shot was fired after the shot through the heart and at a time when Mr. Powell was dying. Mrs. Powell was shot once in the upper abdomen and once in the chest, the latter shot piercing the heart.

Both victims had severe head lacerations. Mr. Powell had five deep scalp wounds, some of which exposed the skull. Mrs. Powell had two deep scalp wounds, both of which exposed the bone. Examination of these wounds indicated to Dr. Wood that "they were struck with a blunt instrument several times in a frenzy." In the opinion of Dr. Wood *the head wounds were inflicted before the gunshot wounds.*

Mrs. Powell's body was found in a sitting position in the bathroom. The officer who found the body "observed a piece of metal, which appeared to be a piece of the door lock, lying on the bathroom floor. The door facing appeared to be splintered. The door was slightly ajar, and it appeared it was split down the section where the lock is placed on the door."

The ingredients of premeditation and deliberation necessary in first degree murder may be inferred from the vicious and brutal circumstances of the homicide. The evidence here shows a complete lack of provocation and a viciousness which demonstrates that death was the actor's objective. The deadly shots through the heart after each victim had been felled and rendered helpless by mortal blows to the head support, almost require, the legitimate inference of premeditation and deliberation. This evidence is sufficient to repel the motions for nonsuit and require submission of the cases to the jury on the issue of murder in the first degree. *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971); *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970); *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541 (1970); *State v. Faust,* 254 N.C. 101, 118 S.E. 2d 769 (1961). Defendant's first assignment of error is overruled.

**[4]** Over defendant's objection the solicitor was permitted to propound the following question to Dr. Robert Rollins, Superin-

tendent of Dorothea Dix Hóspital, a medical expert specializing in the field of psychiatry: "Based upon your own personal examination and interview of Karl DeGregory, *and any other information contained in his official record of which you were the custodian and had available to you,* did you make a diagnosis of the defendant?" Defendant's objection to the italicized portion of the question was overruled and defendant assigns as error the ruling of the court in this respect. Dr. Rollins replied: "Yes I did. For the purposes of our report back to the court, the psychiatric diagnosis was without psychosis; that is, not insane, that Mr. DeGregory was competent to stand trial. . . . Karl DeGregory was assigned to Dorothea Dix Hospital for examination purposes for approximately two months. Based upon my own examination, I am of the opinion that Mr. DeGregory is not a paranoid schizophrenic. I have some general knowledge of the circumstances surrounding the crime with which Karl De-Gregory is charged." On cross-examination, Dr. Rollins testified: "Personally, I spent about three hours with Karl DeGregory. My testimony is predicated on the three hours which I spent with Karl DeGregory and upon the information furnished me by members of my staff. I spent three separate occasions with Karl DeGregory. Mr. DeGregory was responsive to my questions. I had the feeling at times that he was not answering with the completeness that I might have liked, but I thought that not unusual for a person in his situation. . . . I was not treating Mr. DeGregory. I was just diagnosing. . . . [I]n some aspects of the evaluation, it's just as important to observe what the patient doesn't say or how he avoids a question as to how he answers. Other than presenting as comprehensive a report as possible, I don't actually think that any of the tests run were necessary to perform, in my opinion. I do not think the Rorschach test or the MMPI test was necessary. I am satisfied that Karl DeGregory was not criminally insane based upon my three hours with him. . . . [T]he existence of mental illness is not synonymous with not being responsible for what you do. The following quote satisfies my definition of criminal responsibility but not my definition of insanity: 'An accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime and at the time of so doing is laboring under such a defect of reason from disease of the mind as to be incapable of knowing the nature and quality of the act he is doing, or if he does know this, incapable of distinguishing between right and wrong in

relation to such act.' . . . Paranoids are capable of murder. Schizophrenics are capable of murder. Paranoid schizophrenics are capable of murder and are capable of suffering from amnesia afterward."

Defendant asserts that Dr. Rollins based his expert opinion "on information obtained by someone else, which information was inadmissible in evidence," and cites the following quotation from *State v. David*, 222 N.C. 242, 22 S.E. 2d 633 (1942), in support of his contention that this was error prejudicial to his insanity defense: "There are two avenues through which expert opinion evidence may be presented to the jury: (a) Through testimony of the witness based on his personal knowledge or observation; and (b) through testimony of the witness based on a hypothetical question addressed to him, in which the pertinent facts are assumed to be true, or rather, assumed to be so found by the jury." We now explore the validity of this assignment.

Defendant's interpretation of the quotation from *State v. David, supra*, is too limited. The quotation states that an expert may base his testimony on facts within his personal knowledge or observation, or may base his opinion on facts presented in a hypothetical question, but it does not purport to limit facts and information within the personal knowledge of an expert to knowledge *derived solely* from matters personally observed. As demonstrated in opinions of this Court since *State v. David, supra*, an expert witness has wide latitude in gathering information and may base his opinion on evidence not otherwise admissible.

In *Penland v. Coal Co.*, 246 N.C. 26, 97 S.E. 2d 432 (1957), the testimony of a physician was challenged because his opinion was based on statements made to him by the patient during the course of a professional examination. We noted that although the statements of the injured patient were "not admissible as evidence of the facts stated, [they could] be testified to by the physician to show the basis of his opinion," and held that it is permissible for a physician to base his opinion, *wholly or in part*, on such statements, if made by the patient in the course of professional treatment, or during the course of an examination made for the purpose of treatment and cure.

In *Highway Commission v. Conrad*, 263 N.C. 394, 139 S.E. 2d 553 (1965), speaking to the competency of expert witness

testimony in a condemnation proceeding, we quoted with approval the following language from 5 Nichols on Eminent Domain, 3d ed., § 18.42 (1), p. 256: "The fact that certain elements are not independently admissible in evidence . . . does not bar their consideration by an expert witness in reaching an opinion. Thus, it has been said: 'An integral part of an expert's work is to obtain all possible information, data, detail and material which will aid him in arriving at an opinion. Much of the source material will be in and of itself inadmissible evidence but this fact does not preclude him from using it in arriving at an opinion. All of the factors he has gained are weighed and given the sanction of his experience in his expressing an opinion. It is proper for the expert when called as a witness to detail the facts upon which his conclusion or opinion is based and this is true even though his opinion is based entirely on knowledge gained from inadmissible sources.' *(People v. Ganghi Corp.,* 194 C.A. (2d) 427, 15 Cal. Rep. 25)." In accord with these expressions is *State v. Arnold,* 341 P. 2d 1089 (Ore. 1959).

In *Potts v. Howser,* 274 N.C. 49, 161 S.E. 2d 737 (1968), we held it proper to allow a medical expert to give his opinion as to what was shown by a radiologist's report and the accompanying X-rays used by him in diagnosing plaintiff's injuries but not introduced into evidence.

Federal courts have held that a psychiatrist's testimony based on hospital records together with his own observation of defendant is admissible. *United States v. Davila-Nater,* 474 F. 2d 270 (5th cir. 1973); *Birdsell v. United States,* 346 F. 2d 775 (5th cir.), *cert. denied,* 382 U.S. 963 (1965), and cases cited therein.

In *Birdsell* the defendant contended that the testimony of a psychiatrist as to defendant's sanity, based upon a personal interview with the defendant *and* examination of defendant's tests, case history and hospital records, was inadmissible. Judge Friendly, writing for the court, first noted that prior decisions had established that opinions as to sanity contained in hospital records are not admissible under the Business Records Act, 28 U.S.C. § 1732, but that such an opinion is admissible in evidence if the expert rendering it is made available for cross-examination. The court then stated that while the records of a hospital performing psyschiatric investigations with respect to the symptoms recounted by the subject or the results of recognized

psychological tests may, unlike records of many physical symptoms, be useless to a jury and be excludable on that ground, "there is abundant authority that an expert witness who is available for cross-examination at the trial may use such records as the basis of an opinion without the proponent having to call every person who made a recorded observation. [Citations omitted.] With the increased division of labor in modern medicine, the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them; records sufficient for diagnosis in the hospital ought to be enough for opinion testimony in the courtroom." *Birdsell v. United States, supra.*

On these authorities, and on reason as well, we hold it was proper for Dr. Rollins to base his expert opinion as to the sanity of Karl DeGregory upon both his own personal examination and other information contained in the patient's official hospital record. The question was proper and the answer was competent.

We note, moreover, that even had defendant been correct in his assertion that an expert cannot base an opinion on personal examination *plus* inadmissible information obtained from other sources, defendant could not prevail on this assignment. Even though the question put to Dr. Rollins sought his diagnosis of defendant based upon both his personal observation of defendant *and* information contained in defendant's records at Dorothea Dix Hospital, his testimony discloses that his opinion of defendant's sanity is based strictly on his own personal observation of defendant. At one point Dr. Rollins said: "Based upon my own examination, I am of the opinion that Mr. DeGregory is not a paranoid schizophrenic." Later, on cross-examination, he made the following statement: "I am satisfied that Karl DeGregory was not criminally insane based upon my three hours with him." Although Dr. Rollins did at one point in his testimony state that his testimony was based on both his personal interview with Karl DeGregory and information furnished by his staff, it is clear that on the crucial question of Karl DeGregory's sanity, he based his testimony solely on his personal observation of defendant. It thus appears that defendant has not been prejudiced by the doctor's testimony even under the more restrictive view of the law urged by defendant. This assignment is overruled.

Defendant having failed to show prejudicial error, the verdict and judgment in each case must be upheld.

No error.