STATE OF NORTH CAROLINA v. JERRY BYRON STARNES

No. 120A83

(Filed 7 July 1983)

**Criminal Law § 53; Rape and Allied Offenses § 4— first degree rape—expert opinion concerning cause of tears in genital area—properly admitted**

In a prosecution for first degree rape, the medical opinion expressed by a physician with extensive training in pediatrics and experience in having examined hundreds of female children of the victim's age was well within the bounds of permissible medical expert testimony where the doctor testified to the effect that the tears he observed within the interior of the genital area of the victim were probably caused by a penis.

Justice EXUM concurring in result.

APPEAL as of right pursuant to G.S. § 7A-27(a) from a judgment of *Farmer, J.,* imposing a life sentence upon defendant's conviction of first degree rape entered at the 7 December 1982 Criminal Session of Superior Court, WAKE County.

Upon his plea of not guilty defendant was tried upon a bill of indictment, proper in form, charging him with the first degree rape of Dana Eramo, a child six years of age or less, the defendant being over the age of twelve and four or more years older than Dana Eramo. Defendant was represented at trial by court-appointed counsel Robert L. McMillan and Fred M. Morelock. The jury returned its verdict of guilty of first degree rape and Judge Farmer imposed the mandatory sentence of life imprisonment.

*Rufus L. Edmisten, Attorney General, by Thomas G. Meacham, Jr., and Sarah C. Young, Assistant Attorneys General, for the State.*

*Fred M. Morelock, Attorney for defendant-appellant.*

MEYER, Justice.

Only one issue is presented on this appeal—whether, under the particular facts presented, the trial court erred in allowing a State's witness, Dr. Wiegand, to express an opinion in response to a question by the district attorney that the tears he observed in the genital area of the rape victim were probably caused by a penis and in refusing to strike the answer. We hold that under

the particular circumstances presented, the trial court did not err.

The State's evidence may be summarized as follows:

Mrs. Margie Freeman testified that she is the grandmother of the victim, six year old Dana Eramo, whose nickname was "Scooter." Mrs. Freeman's daughter, Donna, the mother of Scooter Eramo, and Scooter's teenage sister Dina, lived with her. On 23 December 1981 Scooter went out to play in the yard at approximately 1:00 p.m. She returned to the apartment about 2:00 p.m. to change shirts because she was too warm. Mrs. Freeman required her to wear a toboggan when she went back out because the weather was breezy. After changing clothes, Scooter went back outside to visit a friend. The grandmother did not see the child again until around 4:00 p.m. that afternoon at Rex Hospital.

Mrs. Freeman's neighbor, Edward B. Patchell, testified that he lived in an apartment located near Mrs. Freeman's. He knew Scooter Eramo as she was a very close friend of his stepdaughter who lived with him and who was the same age as Scooter. The two children played together frequently and Scooter often stayed in his home. On the afternoon of 23 December 1981, he returned home from work a little early due to the Christmas holidays and went upstairs to lie down and rest because he and his wife had plans for that evening. At approximately 2:15 p.m. Scooter came over and knocked on the door. Mr. Patchell went to the window, raised it and told Scooter that his granddaughter would not be home until about 5:00 p.m. He was approximately twelve or fifteen feet from Scooter at that time and noticed a man coming from the apartment complex laundromat which was located only thirty or forty feet away. The man was headed towards his apartment building and towards Scooter. He continued to stand and look out of the window at Scooter and noticed that the man had an unusual walk. The man came between a van and Mr. Patchell's automobile and approached Scooter. The man talked to Scooter and stood within a foot of her for approximately one minute when a second man, who was a close friend from the neighborhood, arrived and started talking to Scooter and the first man. Mr. Patchell testified that he was not concerned because if the three of them were talking, somebody would be there to watch Scooter. Later, on 25 December, Mr. Patchell went down to the detective

offices and identified a picture of the defendant as the first man he saw talking to Scooter. At trial, Mr. Patchell described the man in detail and identified him as the defendant who was seated in the courtroom.

The child, Scooter Eramo, was examined on voir dire for the purpose of establishing her competency to testify. The court ruled that she understood the obligation of the oath which she had taken and had sufficient intelligence to give evidence. She testified that sometime before Christmas of the previous year she went to play with a neighborhood friend. A man asked her to help him find a dog which he described as a white poodle. She testified that she went into the woods with the man to look for the dog and that she "got hurt" in the woods. She testified that she remembered what the man looked like, and she described him as a white man of medium height with curly brown hair. She also described his clothing. From an array, she identified the photograph of the man (later identified as the defendant) in question. She further testified that the man whom she was with in the woods held his hand over her nose and mouth and she could not breathe. She said that the man hurt her nose.

Scooter Eramo further testified that when she left the woods, the man was not with her and she went to get somebody to help her. At the time she left the woods, she was not wearing her toboggan because "the man tore it up." She also testified that she was not wearing her underwear. Upon leaving the woods, she went to a "nice man" who helped her. The man called the police and an ambulance. The police came and she told the police what had happened. She rode in the ambulance to the hospital and saw a doctor, a nurse and her mother. She went with Detective Barbour to his office and picked out a picture of the man who hurt her. She told Detective Barbour what had happened. While on the stand and during her testimony she identified a picture of the defendant as the man who had hurt her.

Douglas E. Joyner, who had lived in Raleigh for fifteen years and was a student at Wake Technical College, testified that on 23 December 1981 he was doing some construction work on a friend's garage and was sitting on the balcony of the two-story garage taking a break. At that time he saw Scooter Eramo and described her as bruised "real bad" under both eyes and across her nose. A

little bit of blood was coming from her nose. He noticed that her clothes were in disarray. He called an ambulance and the police.

Donna F. Eramo, the mother of Scooter Eramo, testified that she worked at her place of employment on 23 December 1981 until midafternoon at which time she went Christmas shopping. She saw her daughter Scooter at Rex Hospital around 4:00 p.m. and described her physical appearance as being "bloody, black and blue, both eyes were filled with blood. She had small blood dots all over her face. Her nose was packed with blood and swollen. She had hand prints on her neck." She stayed with Scooter at the hospital until she took her home. At the hospital and afterwards at home all Scooter would say was that she went to look for a dog and that she hoped they would find the man.

Police officer J. E. DeCatsye of the Raleigh Police Department, the officer who reached the scene where Scooter was found, testified that at the time he saw Scooter she was "very much in disarray as far as her clothing, her shoes were on and they were untied, her shirt was hanging out of her pants, she had soil marks on the back of her shirt and her pants and a portion of her underwear . . . were hanging out the back of the pants and they had signs of defecation on them." He noticed certain physical injuries to her body which consisted of red marks on the left-hand side of her neck, a bruise beneath one eye which extended across the eye and the nose and ended over the other eye. There was some blood around her mouth. When he arrived, the emergency medical service unit was already on the scene and two attendants were treating the little girl. The child told officer DeCatsye that a man had hurt her and upon his inquiry as to what she meant by that she made a statement to him:

> She told me that she had been over at her apartment and had left the apartment where she lives and had gone to a friend's house to play with a friend. When she got there she found out that the friend was not at home so she left that apartment and started walking through the apartment complex. At that point a man approached her and asked her if she would help him look for his lost dog which he described to her as being a white poodle. She agreed to do this with him. After they had looked around for a little bit for the lost dog they walked into some woods for a distance and at this

point the man started playing some games with her, tried to play some games with her that she didn't understand. And from what she told me she started screaming and crying at that point.

Raleigh Detective L. K. Barbour also investigated the incident and testified that he walked over the wooded area in question and found evidence of a scuffle and what "appeared to be torn clothing, panties, in that area." He interviewed the defendant at approximately 9:30 p.m. on 24 December 1981 at the Raleigh Criminal Investigative Division Offices. He had a picture taken of the defendant and arranged a photographic lineup of eight photographs for the purpose of exhibiting them to Scooter and Mr. Ed Patchell. Upon exhibiting the array to the child, she immediately identified the photograph of the defendant as the man who assaulted her. When asked if she were absolutely certain about the identification, she said that she was. Mr. Patchell was also asked to view the photographic array and he identified the photograph of the defendant as the subject he saw coming from the laundromat and approaching Scooter.

At approximately 11:57 p.m. on the evening of 24 December 1981 the defendant Jerry Starnes gave a statement to Detective Barbour in question and answer form as follows:

And my question was: Jerry Starnes, did you assault the little girl. And his answer was: Yes. Question: Jerry, where did the assault take place at. The answer: Behind the ball field. The little girl and I were looking for the dog. We went down in the woods about a hundred feet. She had to pee and I just went crazy. Question: Did you hit her with your fist, Jerry. Answer: Yes. Question: How many times. Answer: It's all flaky. I realized what I had done. I got scared and ran. Question: Jerry Starnes, have you given this confession of your own free will and that no threats or promises have been made to you. The answer was: Yes.

Defendant was then taken to the Wake County Jail and formally charged with rape.

Detective Barbour questioned the defendant again on 28 December 1981 and the defendant gave him another statement which is, in pertinent part, as follows:

I came from the laundromat. Shortly thereafter I saw the little girl on the sidewalk. I asked her if she had seen the dog. I asked her to help me look for the dog. I went on one side of the building and she went down the front side towards the woods. I went by the apartment and got some Vaseline and put it in my pocket. The little girl and I met at the end of the apartment near the woods. We then headed in the direction of the ball field, went in the woods behind the ball field. I was calling the dog as we were going into the woods. About a hundred feet in the woods behind the ball field the girl had to stop and pee. She pulled her pants down and was peeing. I squatted down near her and all of a sudden I must have gone crazy. I grabbed her and she began screaming and crying. I pulled the toboggan she was wearing down over her face and tried to shut her up. I put my hand over her mouth and nose. I must have hit her about twice. I ripped her panties off. I unzipped my pants and took my penis out. I took the Vaseline out and put it on my hand and rubbed it around her crotch and in between her legs. I then rubbed some Vaseline on my penis. Things were kind of flaky. I remember seeing blood on her leg. I had ejaculated and I wiped it on her pants' leg. Then I saw where she had shit. I got scared and ran.

Question: Was the little girl crying when you left. Answer: No. She had stopped crying. Question: Was she conscious. Answer: I don't know. I left her lying there. Question: Did you have in mind to have sexual relations with the little girl when you went back to your apartment to get the Vaseline just before you and the little girl went into the woods looking for the dog. Answer: Yes. Question: Did you put your penis in her vagina. Answer: No, I didn't but that part is flaky. Question: Did you put your fingers in her vagina. Answer: I rubbed Vaseline around the vagina with my fingers.

Dr. Steven F. Wiegand, a physician on duty at the Rex Hospital Emergency Room on 23 December 1981, examined Scooter Eramo at approximately 4:30 p.m. Dr. Wiegand testified that he had extensive training in pediatrics and that he had examined hundreds of female children of Scooter's age. When he first observed Scooter, she was upset and scared. He observed that on her neck were abrasions and bruises in the shape of fingerprints. Several blood vessels were ruptured in both eyes and there was

marked swelling of the nose and the area just below the eyes, and there was clotted blood in her nostrils. He also observed that her clothing was in disarray and dirty.

Dr. Wiegand performed a complete examination including the vaginal and rectal areas. He observed a large amount of fecal material around the rectal and lower back area. He found serosanquineous fluid (clear body fluid) present in the vaginal area and around it. He also found a two or three millimeter tear in the skin on the outer part of the genitalia proper and a five to six millimeter superficial tear slightly deeper into the genital area but "still outside the vaginal area right at the border."

Dr. Wiegand also performed an examination of the *interior* of the vagina using a nasal speculum. His testimony concerning this examination was as follows:

Q. And what did you observe when you examined Dana Eramo's vaginal area?

A. At the lower aspect of the vagina where the hymenal ring was present — is present there was a small three millimeter tear, again with the presence of this fluid as I described before. In addition, there were (sic) some bruising along the lower wall of the vagina or birth canal, as well as some bruising around the upper part of the vagina which borders along the opening of the urethra which is the small tube from which urine passes.

. . . .

A. The tear on the hymenal ring, the area would be at the border between the external vaginal areas, so this would be further in toward the vagina from the other two tears that I described.

Q. Was that tear also at the six to seven o'clock area?

A. That's correct.

Q. Did you notice anything else about the vaginal area of the child when you performed this examination on the 23rd of December of last year?

A. Yes. Also noted were several reddened abraded or scraped areas along the walls of the skin of the vagina. And,

in addition, there were noted some small—about the size of the head of a pin—small bruises present along the skin of the vagina inside of the vagina.

Dr. Wiegand also gave the following testimony which is the basis for the single issue presented on this appeal:

Q. And, Dr. Wiegand, I ask you if you have an opinion based on your experience and based on your training as to what caused the three tears which you have described in the genital area of this child?

MR. MORELOCK: Objection.

THE COURT: Overruled.

A. You want my medical opinion or my own opinion?

Q. If you have an opinion based on your experience and training as a doctor as to what caused these tears in the genital area of a child.

A. I was not there so I cannot say with certainty what did it but my best opinion would be that a penis had probably caused these injuries.

MR. MCMILLAN: Objection and move to strike the answer.

THE COURT: Overruled.

Q. And on what are you basing that opinion?

A. The manner in which the patient's injuries, as best she could tell me, and from my examination, suggested that she had been beaten and had struggled quite violently; further, that there were present secretions which appeared to be seminal fluid.

MR. MORELOCK: Motion to strike, Your Honor.

THE COURT: Motion denied.

Dr. Wiegand also testified on direct examination that:

Q. And, finally, Dr. Wiegand, do you have an opinion based on your education, training as a physician, based on your experience as a physician, and based on your observations of

the physical condition of Dana Eramo on 12-23-81 as to whether or not her, that is, Dana's, vaginal area had been penetrated?

MR. MCMILLAN: Objection.

THE COURT: Overruled.

A. I can answer? Yes, I feel that from the examination that her vaginal area was penetrated.

MR. MCMILLAN: Objection and move to strike the answer.

THE COURT: Motion denied.

Q. And on what have you based that opinion?

MR. MCMILLAN: Objection.

THE COURT: Overruled.

A. I base that on the presence of abrasions, the lacerations that I described, as well as the bruising that occurred around and inside the vaginal area that something caused these injuries.

. . . .

Q. Dr. Wiegand, if I could restate the question. Do you have an opinion based on the presence of these abrasions and lacerations that you observed on Dana Eramo on the 23rd of December, 1981 as to whether or not what caused those injuries penetrated her vaginal opening?

MR. MCMILLAN: Object.

A. I can only say that an object that was larger than the capacity of her vaginal opening to her mid passage was placed there and caused injuries that we have described. I cannot say what object caused those injuries. I can say that because of the number of the injuries and the—the various areas involved that—that more that one penetration or more than one entrance was made but I really cannot say what caused that.

On cross-examination by defendant's counsel, Dr. Wiegand testified:

State v. Starnes

Q. And you say in your conclusion some foreign object did the damage that you found, some foreign object was inserted?

A. That's correct.

Q. Your opinion is, your conclusion is you can't say what that foreign object was?

A. No, I can't.

Special Agent Jed Taub of the North Carolina State Bureau of Investigation, a specialist in forensic serology, was qualified as an expert and testified concerning the vulvar and vaginal swabs taken from Scooter Eramo. He examined them for the presence of sperm and the tests were positive.

Scott Worsham, a forensic chemist with the North Carolina State Bureau of Investigation, was qualified as an expert in hair comparison and identification and testified that a hair taken from Scooter Eramo's clothing was microscopically consistent with head hair taken from the defendant and could have originated from him.

After Dr. Wiegand had heard the testimony of Special Agent Taub, he was called back to the stand and the following exchange took place:

Q. Have you heard the testimony of Mr. Taub with the State Bureau of Investigation?

A. Yes, I have.

Q. Asking you now as an expert medical witness, based on your experience, education, training and observations what significance—Strike that. Do you have an opinion satisfactory to yourself and based partially on Mr. Taub's testimony that semen was found in the vaginal swabs and vulvar swabs which you prepared from Dana Eramo as to what object, if any, penetrated her vagina?

MR. MCMILLAN: Objection.

Q. On the 23rd of December, 1981.

MR. MCMILLAN: Objection.

THE COURT: Let me see counsel.

(Discussion off the record.)

THE COURT: Objection sustained.

Having summarized all of the pertinent evidence, we now, for the sake of clarity, repeat verbatim the brief exchange between the district attorney, the witness, and the trial judge which forms the basis of this appeal:

Q. And, Dr. Wiegand, I ask you if you have an opinion based on your experience and based on your training as to what caused the three tears which you have described in the genital area of this child?

MR. MORELOCK: Objection.

THE COURT: Overruled. (EXCEPTION #2)

A. You want my medical opinion or my own opinion?

Q. If you have an opinion based on your experience and training as a doctor as to what caused these tears in the genital area of a child.

A. I was not there so I cannot say with certainty what did it but my best opinion would be that a penis had probably caused these injuries.

MR. MCMILLAN: Objection and move to strike the answer.

THE COURT: Overruled. (EXCEPTION #3)

Q. And on what are you basing that opinion?

A. The manner in which the patient's injuries, as best she could tell me, and from my examination, suggested that she had been beaten and had struggled quite violently; further, that there were present secretions which appeared to be seminal fluid.

MR. MORELOCK: Motion to strike, Your Honor.

THE COURT: Motion denied. (EXCEPTION #4)

Defendant submits only one assignment of error (Exceptions 2, 3 and 4 above) for review: the trial court's failure to sustain his

objection to the question by the district attorney and its failure to strike the answer of Dr. Wiegand to the effect that a penis had probably caused the tears inside the genital area of the child which he observed. In light of the overwhelming evidence against the defendant, any error in the admission of this testimony would be harmless. Furthermore, we find no error in these rulings by the trial judge.

A fair characterization of Dr. Wiegand's testimony in this regard is that he could not, with certainty from his personal knowledge, say what caused the tears he observed but his best medical opinion based upon his expertise, training as a doctor, his examination, and the presence of fluid was that they had probably been caused by a penis.

Clearly, Dr. Wiegand could not have testified that the defendant raped Scooter Eramo and clearly he did not so testify. He did testify: "I feel that from the examination that her vaginal area was penetrated." This testimony was properly admitted.

A physician who is properly qualified as an expert may offer an opinion as to whether the victim in a rape prosecution had been penetrated and whether internal injuries had been caused thereby.

*State v. Galloway*, 304 N.C. 485, 489, 284 S.E. 2d 509, 512 (1981). *See State v. Hunter*, 299 N.C. 29, 261 S.E. 2d 189 (1980); *State v. Atkinson*, 278 N.C. 168, 179 S.E. 2d 410, *death sentence vacated*, 403 U.S. 948 (1971).

In his brief, the defendant admits that the evidence tended to show, through Dr. Wiegand and Special Agent Taub, that vaginal swabs indicated the presence of semen and sperm inside as well as outside the vaginal area. Defendant also concedes that "[i]t is clear from the evidence the jury could determine that the victim had been penetrated" and "that the victim's vagina had been injured by an object which was larger than her vaginal opening." From this the defendant further concedes that "[t]hese are facts from which the jury could have inferred that the victim was penetrated by the defendant's sexual organ." Defendant contends, however, that these facts are also consistent with the finding that the victim was penetrated by an object other than a penis and that by allowing Dr. Wiegand's testimony that a penis had "prob-

ably" caused these injuries, the option of finding that some other object could have caused the injuries was taken completely away from the jury. Defendant contends that by overruling his objection to the question and by failing to strike Dr. Wiegand's answer, the court allowed the doctor to testify regarding the very question, *i.e.* penetration, which the jury was to answer. We do not agree.

It is the general rule in this jurisdiction that "a witness may not give opinion evidence when the facts underlying the opinion are such that the witness can state them in a manner which will permit an adequate understanding of them by a jury and the witness is no better qualified than the jury to draw inferences and conclusions from the facts. *State v. Sanders,* 295 N.C. 361, 245 S.E. 2d 674 (1978); *State v. Watson,* 294 N.C. 159, 240 S.E. 2d 440 (1978)." *State v. Porter,* 303 N.C. 680, 684-85, 281 S.E. 2d 377, 381 (1981). However, despite the general rule prohibiting opinion evidence, "a witness may employ 'shorthand statements of fact' as a means of referring to matters about which he has previously testified. Such shorthand statements are admissible even though the witness must also state a conclusion or opinion in rendering them. *State v. Yancey,* 291 N.C. 656, 231 S.E. 2d 637 (1977); *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190 (1968); 1 Stansbury's North Carolina Evidence § 125 (Brandis Rev. 1973)." *Id.*

We do not believe that Dr. Wiegand's testimony in this regard constitutes an impermissible invasion of the province of the jury. In *State v. Wilkerson,* 295 N.C. 559, 567-68, 247 S.E. 2d 905, 910 (1978), a case involving a medical opinion that a child was a victim of the "battered child syndrome" this Court said:

> Defendant relies on the principle that an expert witness should not express an opinion on the very issue to be decided by the jury and thereby invade the jury's province. As this Court has noted before, this principle 'is not inflexible, is subject to many exceptions, and is open to criticism.' *Patrick v. Treadwell,* 222 N.C. 1, 4, 21 S.E. 2d 818, 821 (1942), quoted with approval in *Bruce v. Flying Service,* 234 N.C. 79, 66 S.E. 2d 312 (1951). 'It is frequently relaxed in the admission of evidence as to ultimate facts in regard to matters of science or skill.' *State v. Powell,* 238 N.C. 527, 530, 78 S.E. 2d 248, 251 (1953). . . .

Expert medical opinion has been allowed on a wide range of facts, the existence or non-existence of which is ultimately to be determined by the trier of fact. *State v. DeGregory,* 285 N.C. 122, 203 S.E. 2d 794 (1974) (sanity of the defendant); *State v. Potter,* 285 N.C. 238, 204 S.E. 2d 649 (1974) (sanity of defendant and competence of defendant to stand trial); *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971) (probable date of death); *State v. Knight,* 247 N.C. 754, 102 S.E. 2d 259 (1958) (death caused by exertion, fear and anger, rather than blows); *State v. Wilcox,* 132 N.C. 1120, 44 S.E. 625 (1903) (contusion caused by blow with a blunt, covered instrument); . . . .

In *State v. Hunter,* 299 N.C. 29, 36, 261 S.E. 2d 189, 194, this Court held:

Expert opinion testimony is generally admissible when the proffered witness is better qualified than the jury to form and state an opinion on a particular set of facts in a case. *See* 1 Stansbury's North Carolina Evidence § 132 (Brandis Rev. 1973). 'The test is to inquire whether the witness' knowledge of the matter in relation to which his opinion is asked is such, or so great, that it will aid the trier in his search.' *Hardy v. Dahl,* 210 N.C. 530, 535, 187 S.E. 788 (1936).

Dr. Wiegand, as a physician with extensive training in pediatrics and experience in having examined hundreds of female children of this victim's age, was quite obviously better qualified than the jury to form and state an opinion on the particular facts in this case. His opinion was based upon his training and experience; the history given by the victim; his observations and physical examination of the victim; and his findings with regard to the presence of fluid within the victim's vagina. We therefore hold that the medical opinion expressed by Dr. Wiegand to the effect that the tears he observed within the interior of the genital area were probably caused by a penis falls well within the bounds of permissible medical expert testimony.

We are fortified with respect to our holding by previous decisions of this Court. In *State v. Bright,* 301 N.C. 243, 271 S.E. 2d 368 (1980), this Court upheld the testimony of a physician who was allowed to testify that bruises on the face of an assault victim looked as if they were made by fingers. This Court observed

that an expert may give an opinion regarding the cause of a condition, including the nature of the instrument producing a particular injury, when he bases that opinion on facts within his own knowledge. In *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410, *death sentence vacated,* 403 U.S. 948, this Court approved the testimony of the examining physician to the effect that the victim had been penetrated and that her injuries could have been caused by a male sex organ. In *State v. Hunter,* 299 N.C. 29, 261 S.E. 2d 189, the emergency room doctor examined the victim and found vaginal abrasions. He testified that the abrasion occurred a short time before the examination and that the victim had been sexually penetrated by an "assailant" that day. This Court rejected the defendant's argument that such testimony amounted to an opinion upon a jury question. In *State v. Galloway,* 304 N.C. 485, 284 S.E. 2d 509, the physician testified that he found evidence of "traumatic and forcible penetration" consistent with the alleged rape. This Court held in effect that, because an expert could testify as to penetration, the expert's conclusion of rape was a shorthand statement of the facts. We find our decision in the case at bar consistent with the holding in these prior cases.

While the foregoing testimony of Dr. Wiegand was the sole issue presented on this appeal, we have, nevertheless, examined the entire record on appeal and find that defendant had a fair trial free of prejudicial error.

No error.

Justice EXUM concurring in result.

The facts and the legal issue presented are clearly and accurately expounded in the majority opinion. I disagree with the majority's conclusion that it was not error to admit Dr. Wiegand's opinion that "a penis had probably caused" the tears in the victim's vagina. In light of the substantial evidence, apart from Dr. Wiegand's testimony, that defendant's penis did cause these tears and penetrate the victim's vagina, I am satisfied that the error in admitting Dr. Wiegand's opinion about it is not reversible.

If Dr. Wiegand had had a *medical* opinion about the matter based on his observation and perhaps the characteristics of the vaginal tears themselves, I would agree that he should have been

permitted to express it. His own testimony makes it abundantly clear that he had no *medical* opinion that a penis caused the tears. When asked upon what his opinion was based, he answered:

> The manner in which the patient's injuries, as best she could tell me, and from my examination, suggested that she had been beaten and had struggled quite violently; further, that there were present secretions which appeared to be seminal fluid.

It requires no medical expertise to infer from these facts that a penis probably caused the tears. The physician was in no better position than the jury to make such an inference from the facts which he posited. If this answer were not enough to indicate his lack of a medical opinion, surely the physician's other testimony makes it plain. He said flatly:

> I can only say that an object that was larger than the capacity of her vaginal opening to her mid passage was placed there and caused injuries that we have described. *I cannot say what object caused those injuries.* I can say that because of the number of the injuries and the—the various areas involved that—that more than one penetration or more than one entrance was made *but I really cannot say what caused that.* [Emphasis supplied.]

Then, on cross-examination, he said:

> Q. And you say in your conclusion some foreign object did the damage that you found, some foreign object was inserted?
>
> A. That's correct.
>
> Q. Your opinion is, your conclusion is you can't say what that foreign object was?
>
> A. No, I can't.

It was, of course, proper for the physician to give his medical opinion that the victim's vagina had been penetrated by something. His medical expertise obviously led him to formulate an opinion on this. He was in a better position than the jury to assess the presence or absence of some kind of penetration.

It was improper, however, to take the physician's opinion that the penetrating object was a penis because by his own admission he had no such opinion arising out of his medical expertise.