IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-258

No. COA21-402

Filed 19 April 2022

Wake County, No. 21 SPC 0287

IN THE MATTER OF: A.J.D, Jr.

Appeal by Respondent from Order entered 17 February 2021 by Judge Anna E. Worley in Wake County District Court. Heard in the Court of Appeals 8 February 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Milind K. Dongre, for the State*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Jillian C. Katz, for respondent-appellant*

HAMPSON, Judge.

**Factual and Procedural Background**

Respondent-Appellant A.D. (Respondent) appeals from an Involuntary Commitment Order entered in Wake County District Court declaring Respondent mentally ill, a danger to self, and ordering Respondent be committed to an inpatient facility for forty-five days. The Record reflects the following:

On 26 January 2021, Edward Cashwell, a nurse at Wake County Detention Center, signed an Affidavit and Petition for Involuntary Commitment in Wake County District Court alleging Respondent was mentally ill and a danger to himself

or others or in "need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." The same day, a magistrate issued a form Findings and Custody Order finding reasonable grounds to believe Respondent was mentally ill and a danger to himself or others, and ordering Respondent to be taken into custody within twenty-four hours for examination by a person authorized by law to conduct the examination.

¶ 3        The next day Respondent was taken into custody and examined by Adelmar Winner (Winner), a licensed clinical social worker at UNC WakeBrook. Upon examination, Winner submitted a First Examination for Involuntary Commitment report. In this report, Winner stated Respondent has "a history of Schizoaffective Disorder and Autism" and "had an accident due to walking the middle of traffic while actively psychotic." Winner continued stating:

> Patient has long history of non compliance with medication and going from state to state, running away from the 'people who implanted a microchip in his head.' . . . He endorses paranoia in references to his parents 'stealing millions of dollars from him' and endorses several delusions including that he is 'a valuable witness of federal case.'

¶ 4        On 29 January 2021, Respondent underwent a second evaluation, conducted by Winner, at UNC WakeBrook. Winner's report stated:

> [Respondent] has a history of autism and schizoaffective disorder, recently missing for 10 years and came to Raleigh to see daughter (which he never did). [Respondent] is . . . psychotic, believes there is a federal conspiracy against him and he does not believe his

parents are his guardians. He believes he is an attorney with the supreme court.

Winner also opined Respondent met the criteria for commitment because Respondent is "an individual with a mental illness" and is "dangerous to self or others."

¶ 5    On 11 February 2021, after a continuance, the trial court heard Respondent's case pursuant to N.C. Gen. Stat. § 122C-268. In support of the Petition, the State called Dr. Michael Zarzar to testify. Dr. Zarzar testified Respondent has a history of schizophrenia with significant periods of delusions in the past. Respondent initially presented to their crisis assessment service (CAS) on petition by the Wake County Detention Center (Center). Dr. Zarzar explained after Respondent arrived at the Center, a jailhouse nurse became concerned about his mental status after he made a statement about suicide, and noticed he was exhibiting symptoms of paranoia and delusions. Dr. Zarzar further testified:

> During the initial assessment with the clinicians in CAS, [Respondent] had voiced that he was running away from people who were implanting chips in his head and trying to get away from them. He also said that his family, his parents were stealing millions of dollars from him. He said that he was an attorney, and he said that he had evidence that was significant for a federal case and that he was supposed to be testifying.

Dr. Zarzar believed Respondent's delusions were driving his behavior and putting Respondent in positions of danger. For example, Dr. Zarzar explained Respondent had a history of walking down the middle of the road and had actually been hit by a

car a couple days before he was taken to the Center. Respondent also had paranoia around his identification and would "erase his name if it was on any whiteboard and insist his name not be on the door."

Moreover, Dr. Zarzar testified when Respondent presented to CAS, he refused to take any medications, and clinicians had discovered him "cheeking" his medications or hiding it in his mouth to avoid swallowing it. Thereafter, the clinicians had to crush the medication and put it in liquid to administer the medication. Dr. Zarzar also testified after being on medications for a while, Respondent continued to have paranoia about his identification. For example:

> He talks about being certified by the U.S. Treasury, and when you ask him what being certified by the U.S. Treasury means, he's said surrendering his identity to the U.S. Treasury. And that was as recently as today.

Ultimately, Dr. Zarzar testified that in his opinion: "Respondent is suffering from schizophrenia, and I believe that he's in an acute episode of the schizophrenia." However, Dr. Zarzar explained Respondent doesn't view himself as having any illness and denies being in psychiatric treatment so "with this continued paranoia that he still acts upon that still drives his decisions and his history of putting himself in dangerous situations . . . I'm very worried that he would represent a danger to himself." Dr. Zarzar also explained they were still in the process of adjusting Respondent's medications to help with the delusions, and he wanted to keep

Respondent for at least 45 to 90 days but would consider discharging him earlier if his delusions began to resolve.

¶ 8 After Dr. Zarzar testified, Respondent took the stand. Respondent denied having been previously diagnosed with schizophrenia and denied being previously hospitalized with schizophrenia despite Dr. Zarzar's testimony to the contrary. Nevertheless, Respondent testified he had somewhere to live and did not have any problems with taking medication.

¶ 9 After Respondent testified, the trial court entered a written Order concluding Respondent "has a mental illness, he's a danger himself, and he's to be committed to a period not to exceed 45 days." The trial court also found by clear, cogent, and convincing evidence, the following relevant facts supporting the ultimate Finding of dangerousness to self:

> 3. . . . in the days preceding his admission, the Respondent had received medical treatment for injuries he sustained after being struck by a vehicle while on foot.
>
> 4. . . . Respondent has a history of failing to properly take psychiatric medications and of putting himself in dangerous positions, including a 2010 incident in which he was reported to have walked in the road.
>
> 5. Respondent denied any past mental illness diagnoses or psychiatric hospitalizations. Dr. Zarzar testified that the Respondent has no insight into his mental illness.
>
> 6. Dr. Zarzar testified that while the Respondent has been under his care, he has observed symptoms of schizophrenia . . .

8. The Court finds that the above-described and uncontroverted testimony about the 2010 incident comprises applicable evidence of a previous episode of dangerousness to self which the Court should consider in determining reasonable probability of physical debilitation.

12. The Court finds that all the foregoing testimony demonstrates grossly irrational behavior and grossly inappropriate behavior to the situation by Respondent; actions Respondent was unable to control; and behavior evidencing severely impaired insight and judgment by Respondent.

14. The court finds . . . a reasonable probability that absent up to forty-five additional days of inpatient treatment given pursuant to Chapter 122C, (a) the Respondent will be unable either to exercise self-control, judgment, and discretion in the conduct of his daily responsibilities and social relation, or to satisfy his need for nourishment, personal, and medical care, shelter, and self-protection and safety; and (b) there's a reasonable probability of serious physical debilitation of Respondent within the near future.

Respondent filed Notice of Appeal from the trial court's Order on 24 February 2021.

## **Appellate Jurisdiction**

Respondents in involuntary commitment actions have a statutory right to appeal a trial court's order. N.C. Gen. Stat. § 122C-272 (2021) ("Judgment of the district court [in involuntary commitment cases] is final. Appeal may be had to the Court of Appeals by the State or by any party on the record as in civil cases."). Rule 3 of our Rules of Appellate Procedure requires a party to file written notice of appeal

thirty days after the entry of an order of a superior or district court rendered in a civil action or special proceeding. N.C.R. App. P. 3(a), (c) (2021).

In this case, Respondent filed written notice of appeal on 24 February 2021, within the thirty-day period following entry of the Order on 17 February 2021. Furthermore, although the commitment period has expired, the appeal is not moot because the challenged order may have collateral legal consequence. *See In re Moore*, 234 N.C. App. 37, 41, 758 S.E.2d 33, 36 (2014) ("The possibility that respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral legal consequence, convinces us that this appeal is not moot."). Thus, Respondent's appeal is properly before this Court.

## Issue

The sole issue on appeal is whether the trial court had competent evidence to support its Finding there was a reasonable possibility of Respondent suffering serious physical debilitation in the near future without treatment.

## Analysis

Respondent's sole argument on appeal is that there was insufficient evidence to support the trial court's Finding of dangerousness to self because Dr. Zarzar's testimony regarding Respondent's history of commitment, medication noncompliance, and placing himself in dangerous situations is based on hearsay, and therefore, incompetent evidence.

¶ 15    "To support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . ." N.C. Gen. Stat. § 122C-268(j) (2021). "Findings of mental illness and dangerousness to self are ultimate findings of fact." *In re B.S.*, 270 N.C. App. 414, 417, 840 S.E.2d 308, 310 (2020) (citing *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980)). On appeal, "[t]his Court reviews an involuntary commitment order to determine whether the ultimate findings of fact are supported by the trial court's underlying findings of fact and whether those underlying findings, in turn, are supported by competent evidence." *B.S.*, 270 N.C. App. at 417, 840 S.E.2d at 310 (citing *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016)). As such, the trial court must also record the facts that support its "ultimate findings[.]" *Whatley*, 224 N.C. App. at 271, 736 S.E.2d at 530.

¶ 16    Nevertheless, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion and obtained a ruling upon the party's request, objection, or motion." N.C.R. App. P. 10 (b)(1). Indeed, when a respondent fails to raise an objection on hearsay grounds at the court below, "any objection has been waived, and the testimony must be considered competent evidence." *In re F.G.J.*, 200 N.C. App. 681, 693, 684 S.E.2d 745, 753-54 (2009).

¶ 17        Here, Respondent does not argue the trial court failed to support its ultimate

Finding but argues the trial court committed reversible error by relying on the alleged

hearsay evidence in making its Findings of Fact.  However, a review of the Record

reveals Respondent did not object to the admission of Dr. Zarzar's testimony on any

basis, including impermissible hearsay.  As such, Respondent failed to preserve this

issue for appellate review, and the testimony must be considered competent evidence.

*See id.*

¶ 18        Moreover, Dr. Zarzar testified as an expert witness.  Rule 703 of the Rules of

Evidence provides:

> The facts or data in the particular case upon which an expert
> bases an opinion or inference may be those perceived by or made
> known to him at or before the hearing.  If of a type reasonably
> relied upon by experts in the particular field in forming opinions
> or inferences upon the subject, the facts or data need not be
> admissible in evidence.

N.C. Gen. Stat. § 8C-1, R. 703 (2021).  Indeed, our Supreme Court has held it is

appropriate for a psychiatrist to base an expert opinion on both the psychiatrist's

personal examination of the patient and other information included in the patient's

official medical records.  *State v. De Gregory*, 285 N.C. 122, 134, 203 S.E.2d 794, 802

(1974).

¶ 19        Dr. Zarzar testified he learned of Respondent's history of treatment non-

compliance and prior hospitalizations from Respondent's medical records, speaking

with Respondent's parents about his delusional behavior, and reviewing the police report from the 2010 incident when Respondent walked in the middle of the road. This kind of information is precisely the type that a medical expert may use as the basis for the expert's opinion. *See State v. Daniels*, 337 N.C. 243, 269, 446 S.E.2d 298, 314 (1994) (holding psychiatrist may properly base expert opinion on "(1) her review of the evaluations of other doctors who had interviewed defendant; (2) a personal discussion with a doctor in whose care defendant had been placed; and (3) interviews of defendant's friends, employers, and family"), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995); *De Gregory*, 285 N.C. at 132, 203 S.E.2d at 801 ("[A]n expert witness has wide latitude in gathering information and may base his opinion on evidence not otherwise admissible."). Thus, the rule against hearsay did not bar Dr. Zarzar from testifying about Respondent's medical history and prior incidents of psychosis as he properly relied on this information in forming his expert opinion. Moreover, since Dr. Zarzar's testimony was competent evidence, the trial court did not err in relying on this testimony in making its Findings of Fact.

## **Conclusion**

Accordingly, since Respondent did not object to Dr. Zarzar's testimony on the basis of hearsay and Dr. Zarzar's testimony was not inadmissible hearsay, we conclude the trial court based its Findings of Fact on competent evidence and affirm the Order.

AFFIRMED.

Judges WOOD and GORE concur.