STATE OF NORTH CAROLINA v. JEANINE LYNN SPANGLER

No. 417A84

(Filed 5 September 1985)

**1. Criminal Law § 5.1— insanity—burden of proof properly on defendant**

The trial court in a prosecution for the murder of defendant's ten-month-old son properly placed the burden of proving insanity on defendant even though defendant's attorney was frustrated by defendant in his efforts to obtain the optimum evidence necessary to the insanity defense.

**2. Criminal Law § 112.2— instruction on role of jury—no error**

The trial court did not err in a first degree murder prosecution by instructing the jury that its only concern was to determine whether defendant was guilty, rather than instructing the jury that it was to determine whether or not defendant was guilty, because the judge's remarks viewed contextually conveyed to the jury venire what the jury's appropriate role in the trial was to be.

**3. Constitutional Law § 63; Jury § 7— death qualifying jury—no error**

The trial court in a first degree murder prosecution did not err by excluding a prospective juror for cause solely because of his unequivocal opposition to capital punishment.

**4. Criminal Law § 63.1— cross-examination restricted—no error**

In a prosecution for first degree murder in which defendant claimed insanity, the trial court did not err during cross-examination of defendant's cell mate by sustaining objections to questions intended to elicit testimony that defendant had acted abnormally while incarcerated. The testimony would have been repetitive because defense counsel intended to call a psychologist and defendant herself to testify about defendant's mental condition; moreover, defendant was able to ask the desired questions after rephrasing them.

**5. Criminal Law § 43.4— first degree murder—pathologist's slides of victim admissible**

In a prosecution for the first degree murder of a ten-month-old child, the trial court did not err by permitting a pathologist to use photographic slides to

illustrate the nature and severity of the injuries sustained by the child prior to his death and to illustrate the cause of his death; furthermore, the slides were not especially gruesome or gory.

**6. Homicide § 21.5— first degree murder of child—evidence sufficient**

　　In a prosecution for the murder of defendant's ten-month-old child, the trial court properly denied defendant's motions to dismiss where defendant's cell mate testified that defendant told her that she smashed her baby's head against the bathtub in order to kill him and that she had read books prior to killing the baby on how to administer lethal head blows and then position the body so that the blood flowed away from the wound in order to camouflage it; the pathologist's evidence tended to corroborate the cell mate's testimony regarding the cause of death; and there was evidence that defendant admitted striking the child when she brought the baby to the hospital. G.S. 15A-1227.

**7. Criminal Law § 63.1— first degree murder—insanity defense—psychiatrist's opinion limited to killing**

　　In a prosecution for first degree murder in which defendant pled insanity, the trial court did not err by allowing a psychiatrist to give her opinion regarding defendant's ability to distinguish right from wrong with reference to the particular offense. The fact in issue was defendant's ability to distinguish right from wrong precisely in relation to taking another human being's life and the expert opinion rendered by the psychiatrist was relevant to this issue because it tended to prove that defendant knew it was wrong to kill her baby or anyone else. G.S. 8-58.13.

**8. Criminal Law § 53— psychiatrist's testimony—reliance on test performed by others—admissible**

　　In a prosecution for first degree murder in which defendant pled insanity, the trial court did not err by permitting a psychiatrist to testify about the results of a test she did not personally perform where the testimony was admissible under the exception to the hearsay rule enunciated in *State v. Wade*, 296 N.C. 454.

**9. Homicide § 30.2; Criminal Law § 115— first degree murder—failure to charge on voluntary manslaughter—no error**

　　The trial judge in a prosecution for first degree murder correctly declined to instruct the jury on voluntary manslaughter where defense counsel wanted the trial judge to submit the charge of voluntary manslaughter to the jury without any evidence to justify it in order to give the jury an offense upon which it could compromise.

**10. Criminal Law § 130; Trial § 50— verdict returned after fifteen minutes—no error**

　　The trial court in a first degree murder prosecution did not err by denying defendant's motion to set aside the verdict on the grounds that the jury returned its verdict fifteen minutes after it retired. Shortness of time in deliberating a verdict in a criminal case does not constitute grounds for setting aside a verdict; brevity of deliberation should be questioned only if there is evidence of some misconduct on the part of the jury or the trial judge believes that the jury acted with a contemptuous or flagrant disregard of its duties.

Justice BILLINGS did not participate in the consideration or decision of this case.

DEFENDANT appeals as a matter of right pursuant to G.S. 7A-27 from the judgment entered by *Allsbrook, J.,* during the 13 February 1984 Criminal Session of Superior Court, EDGECOMBE County, sentencing defendant to life imprisonment upon her conviction of murder in the first degree.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the State.*

*Cameron S. Weeks, for defendant-appellant.*

FRYE, Justice.

Defendant raises eleven assignments of error on her appeal to this Court. We conclude that defendant received a fair trial free from prejudicial error. Therefore, each of defendant's arguments on appeal is rejected.

The evidence introduced during a jury trial tended to show that on the afternoon of 26 October 1983, defendant took her ten-month-old son, Jacob Harley Warner, to the emergency room of Nash General Hospital. She placed the baby in a nurse's arms and said, "I think my baby died yesterday, but I think he took a breath today." It was determined that the baby had been dead for some time. The baby's body was stiff and was bruised in various places.

At the hospital, defendant told medical personnel "that she had occasionally slapped the child and had slapped the baby around because the baby made her nervous; that they were very poor, that they hadn't had a lot of food to eat and that the baby was fussing and crying and that she had never hit the child with her fist and . . . that the bruises that were on the child then were not places that she had hit the child but places where the blood had been pooled after it died." Certain witnesses for the State testified that defendant showed very little emotion, seemed very nervous, but not remorseful, after the incident.

Defendant had been living in a trailer at the Wesleyan Circle Trailer Park near Whitakers since approximately July, 1983 and prior to that time had lived in Daytona Beach, Florida, with the

child's father, Joseph Warner. Defendant consistently denied mistreatment of the child and explained that she had not brought the child to the hospital earlier because of the previous experience when she had been suspected of child neglect or abuse when the child had been scalded.

An autopsy revealed multiple injuries on the body, abrasions or scraping wounds over the back and top of the head, bruises or contusion abrasions on the forehead and various other bruises and fractures to the body, particularly the skull. The child also had internal injuries. Defendant testified that the baby had been attempting to walk and had pulled up on the couch, taken a couple of steps from the couch, then fell and hit its head at approximately 10:30 a.m. on 25 October 1983, the day before she took the baby to the hospital.

An expert pathologist who performed the autopsy concluded that death was caused by the skull fracture and hemorrhage into the skull and injury to the brain. It was his opinion that the fracture of the skull was caused by a blunt force injury to the back of the head, which occurred just prior to death. Furthermore, the pathologist testified that in his opinion the injury that caused the child's death could not have been caused by a child of Jacob Warner's size and weight falling to the floor and striking his head because "[t]he head would have had to have been in a fixed position and an object would have had to hit it, at least the head would have had to be affixed with regard to the body."

Paulette Gibbs, a fellow inmate of defendant, testified that defendant first denied being responsible for her son's death and told her it was all a mistake and that she would be released as soon as the autopsy report came in. Defendant made statements to Ms. Gibbs, such as, "Since when is it against the law to beat your own child?" The witness described defendant's conduct in the jail as being odd in various ways. She testified that later defendant told her of books she had read that described the three vulnerable spots in a person's skull that were susceptible to skull fracture and also how you could lay a body a certain way, so that blood would flow in the direction away from the wound to disguise the way a person had been killed. Furthermore, Ms. Gibbs testified that defendant confessed to her that she had killed her child by taking the child's head in her hands and hitting it on the

side of the bathtub and that she only had to do it twice because she knew exactly where to do it this time.

Testimony further revealed that defendant had been hospitalized several years earlier in Florida. Defendant testified that she had been suffering catatonic withdrawal and received electric shock treatment as well as continued medication afterward. Defendant distrusted medical doctors and frustrated her attorney's attempts to obtain her medical records in an effort to assist in her defense of insanity. A social worker, a medical doctor, and a psychotherapist all testified that they were of the opinion that defendant did not on 25 October 1983 have sufficient mental capacity to be able to distinguish between right and wrong. Also, defendant's father and mother testified about her background and history, expressing essentially the same opinion regarding her mental incapacity at the time of the baby's death. A psychiatrist for the State testified on rebuttal that in her opinion defendant did have the ability to distinguish right from wrong with reference to this particular offense.

After the judge gave his charge, the jury deliberated for fifteen minutes and returned with a verdict of guilty of first-degree murder. After being convicted, defendant agreed to an examination by a psychiatrist, who testified that defendant was and had been, a schizophrenic and that on 25 October 1983 she could not have had the capacity to appreciate the criminality of her conduct. Thereafter, the jury recommended that defendant be sentenced to life imprisonment. Defendant gave timely notice of appeal to this Court pursuant to G.S. 7A-27 after the judge sentenced her to life imprisonment.

I.

[1] This Court will resolve each of the eleven assignments of error raised by defendant. First, defendant argues that the trial court committed reversible error in placing the burden of proof regarding the insanity defense on defendant. Certainly, the thrust of defendant's defense was that she was insane when she killed her ten-month-old child. Defendant acknowledges the rule in this State, which places the burden of proof on the defendant to establish the affirmative defense of insanity. *State v. Wetmore*, 298 N.C. 743, 259 S.E. 2d 870 (1979); upheld in *State v. Heptinsall*, 309 N.C. 231, 306 S.E. 2d 109 (1983). However, defendant argues that,

considering the circumstances of this case, the State should be required to prove that defendant was sane at the time of the crime.

This Court recognizes that defendant's attorney was frustrated in his efforts to obtain the optimum evidence necessary to the insanity defense. This reason alone is not sufficiently compelling to persuade us to change a rule that has been espoused by this Court as the correct rule. This assignment of error is therefore overruled.

## II.

[2]  Next, defendant argues that the trial judge committed error by giving instructions to the jury that could have led them to believe that they were required to find defendant guilty of some criminal charge and could not acquit defendant. This assignment of error stems from the following remarks made by the court:

> In this case the defendant, Ms. Spangler, is charged as a result of an incident that allegedly occurred on October 25, 1983 with first-degree murder, which allegedly results from the death of one Jacob Harley Warner.
>
> Now, to this charge and as to any other charge about which you will be instructed, the defendant has entered a plea of not guilty and says that she is not guilty. Furthermore, the defendant has raised the defense of insanity and says that she is not guilty also by reason of insanity.
>
> Now, as I said, the defendant in this case is accused of murder in the first degree. The fact that she has been charged with this offense is no evidence of her guilt and the State must prove that she is guilty and the State must do so beyond a reasonable doubt, which I later shall define for you.
>
> *   *   *   *
>
> (However, prior to that time [referring to a G.S. § 15A-2000 sentencing hearing] the only concern of the trial jury is to determine whether the defendant is guilty of the crime charged, or of any lesser included offenses about which you will be instructed.) DEFENDANT EXCEPTS.

Defendant argues that the portions of the foregoing remarks to which defendant excepts "could well have given the prospec-

tive jurors the impression that they would be required to find defendant guilty of first degree murder or some lesser included offense." Defendant cites no authority to support this particular argument. Defense counsel failed to object to this portion of the judge's introductory remarks. Employing a plain error analysis, we do not view such remarks, when read in context, to be prejudicial to defendant. Defendant contends that the trial judge should have charged, "the only concern of the trial jury is to determine whether *or not* the defendant is guilty . . . ," as opposed to what he actually said. When viewed contextually, the judge's remarks conveyed to the jury venire what the jury's appropriate role in the trial was to be. We do not agree with defendant's contention that the judge conveyed to the jury that their job was to convict defendant, there being no other alternative available to them. This assignment of error is rejected.

## III.

[3] Defendant further argues that the trial court committed reversible error by excusing a prospective juror for cause solely because of his unequivocal opposition to capital punishment, in violation of *Witherspoon v. Illinois,* 391 U.S. 510 (1968). In the recent case of *State v. Jenkins,* 311 N.C. 194, 317 S.E. 2d 345 (1984), this Court rejected this argument and explained as follows:

> Defendant next contends that the trial judge erred by permitting the State to 'death qualify' the jury prior to the guilt phase of the trial. He argues that permitting challenges for cause of jurors who would be unwilling to impose the death penalty denied him a fair determination of his guilt or innocence by a jury constituting a representative cross-section of the community.
>
> This Court has consistently rejected this argument, *State v. Adcock,* 310 N.C. 1, 310 S.E. 2d 587 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E. 2d 170 (1983); *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980). We do not elect to overrule these well-reasoned cases. This assignment of error is overruled.

*Id.* at 204, 317 S.E. 2d at 351; *see also, State v. Murray,* 310 N.C. 541, 313 S.E. 2d 523 (1984), and *Keeten v. Garrison,* 742 F. 2d

2d 129 (4th Cir. 1984) which reject the argument that "death qualified" juries are "guilt prone."

We continue to reaffirm our prior holdings regarding this issue and reject defendant's argument that she was deprived of her right to a fair trial because her jury was "death qualified."

### IV.

[4]   Next, defendant contends that the trial judge committed error when he limited defense counsel's cross-examination of the State's witness, Paulette Gibbs. Ms. Gibbs was a prisoner incarcerated in the same cell with defendant at the Edgecombe County Jail for several days after defendant was arrested. Ms. Gibbs testified that defendant had made a number of incriminating statements to her on October 26-27, 1983, including the statement that defendant had smashed her baby's skull against the bathtub in order to kill him. On re-cross examination, defense counsel attempted to elicit testimony from Ms. Gibbs that defendant had acted abnormally while incarcerated with her, apparently in an effort to bolster her insanity defense. The following exchange took place:

Q. (By defense attorney Weeks): You know, do you not, that she was sent to Dix Hill right after you talked to her, a little while afterwards?

MR. BONEY: OBJECTION.

COURT: SUSTAINED. THE DEFENDANT EXCEPTS. THIS IS DEFENDANT'S EXCEPTION NO. 4.

MR. WEEKS: It is in the record, Judge.

COURT: SUSTAINED. THE DEFENDANT EXCEPTS. THIS IS DEFENDANT'S EXCEPTION NO. 5.

MR. WEEKS: She went there by order signed by the Superior Court . . .

COURT:  Go to something else, please.

Q. She did go to Dix Hill—before she went, if she did . . . .

MR. BONEY: OBJECTION.

MR. WEEKS: Let me finish the question.

Q. Didn't you tell the matron down there she was mighty peculiar and giggling?

MR. BONEY: OBJECTION.

COURT: SUSTAINED. Restate the question, please.

THE DEFENDANT EXCEPTS. THIS IS DEFENDANT'S EXCEPTION NO. 6.

Defense counsel then rephrased the questions and the answers were admitted.

Generally, control of the manner and scope of cross-examination of a witness is left to the discretion of the trial judge. *See State v. Burgin*, 313 N.C. 404, 329 S.E. 2d 653 (1985). Absent a manifest abuse of discretion, the trial judge's ruling will not be overturned on appeal. *State v. Searles*, 304 N.C. 149, 282 S.E. 2d 430 (1981). The record reveals that the trial judge controlled the cross-examination of Ms. Gibbs' testimony in what seems to be an effort to avoid needless consumption of time since defense counsel intended to call a psychologist and defendant herself to testify about defendant's mental condition. Eliciting the additional testimony from Ms. Gibbs would have been repetitive in nature. Assuming, *arguendo*, error was committed, it was cured when defendant was able to ask the desired questions after rephrasing them.

## V.

[5] The next assignment of error relates to the forensic pathologist's use of photographic slides to illustrate his testimony. Dr. Robert Zipf, the pathologist who performed the autopsy on the body of Jacob Warner, observed multiple external and internal injuries to the child's body. Based on the examination, Dr. Zipf testified that the child died from hemorrhage of and injury to the brain, which occurred as a result of a blunt force injury to the head. In order to explain the number, size, nature and location of the child's injuries and to explain to the jury the cause of death, Dr. Zipf used photographic slides to illustrate his testimony. Defendant objected to the slides, arguing that they were inflammatory and highly prejudicial.

This Court has held that photographs and slides are admissible in evidence to illustrate the testimony of a witness. Further-

more, photographs or slides which depict a gruesome and revolting scene indicating a vicious crime do not render them incompetent in evidence when they are properly authenticated as accurate portrayals of conditions observed and related by the witness who uses them to illustrate his testimony. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983); *State v. Dobbins*, 306 N.C. 342, 293 S.E. 2d 162 (1982); *State v. Gibbons*, 303 N.C. 484, 279 S.E. 2d 574 (1981).

The slides were properly used to illustrate the nature and severity of the injury sustained by the child prior to his death and to illustrate the cause of his death, as Dr. Zipf was testifying. Furthermore, our review discloses that the photographic slides were not especially gruesome or gory. Therefore, the trial judge did not err when he denied defendant's motion to prevent the witness from using the slides to illustrate his testimony.

## VI.

[6] Defendant further argues that the trial court committed reversible error when it denied defendant's motions to dismiss at the close of the State's case and again at the close of all the evidence. It is axiomatic that, upon a motion for dismissal of charges against a defendant pursuant to G.S. 15A-1227, the evidence must be considered in the light most favorable to the State. The State is entitled to every reasonable inference that can be drawn from the evidence. Contradictions and discrepancies do not warrant dismissal of a case. They are for the jury to resolve. The trial judge must consider all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982).

After reviewing the evidence presented in the instant case, we conclude that there was ample evidence to take the case to the jury. Ms. Gibbs testified concerning admissions made to her by defendant. Defendant told her that she smashed the baby's head against the bathtub in order to kill him. Defendant also told Ms. Gibbs that she had read books prior to killing the baby, which described how to administer lethal head blows and then position the victim's body so that the blood flowed away from the wound in order to camouflage it. If the jury chose to believe Ms. Gibbs, this alone could be sufficient evidence of malice, premeditation, and deliberation.

Additionally, there was evidence from the pathologist that tended to corroborate Ms. Gibbs' testimony regarding the cause of death. When defendant brought the baby to the hospital, there was evidence that she admitted to striking the child. At the morgue she reached for her child, cried, and said, "I'm sorry Jacob, I'm so sorry, I'm so sorry." All of this evidence, when viewed in the light most favorable to the State, was sufficient to carry the State's case to the jury. From this evidence, the jury could infer that defendant intended to kill her child, thought about the manner and method in which to do it, and then carried out her plan. The trial judge correctly denied defendant's motions to dismiss.

## VII.

[7] Next, defendant argues that the court committed reversible error in allowing Dr. Rood to give her opinion regarding defendant's ability to distinguish right from wrong with reference to the particular offense. The State called Dr. Rood, a psychiatrist, as a rebuttal witness after defendant had concluded her defense. Dr. Rood testified that she was a psychiatrist, and defendant stipulated to the fact that the doctor was an expert. Dr. Rood examined defendant between 18 November and 6 December 1983, pursuant to a court order to evaluate defendant's mental capacity to proceed to trial. Based upon this evaluation, the doctor testified that it was her expert opinion "that she [defendant] would have known right from wrong with respect to killing." This conclusion was reached after administering certain evaluative tests to defendant while she was at Dorothea Dix Hospital. Defendant contends that it was erroneous to allow Dr. Rood to render her opinion that defendant had the mental capacity to distinguish right from wrong *only* with respect to killing someone. Defendant argues that this limitation to her opinion was erroneous. We disagree.

Under the provisions of G.S. 8-58.13, a witness is allowed to render an expert opinion if scientific, technical, or other specialized knowledge will assist the jury to understand the evidence or to determine a fact in issue, as long as the witness has the requisite expertise to be considered an expert. In the instant case, Dr. Rood was clearly an expert psychiatrist. The defendant stipulated to this.

The fact in issue was defendant's ability to distinguish right from wrong, precisely in relation to taking another human being's life. The expert opinion rendered by Dr. Rood was relevant to this issue because it tended to prove that defendant knew it was wrong to kill her baby or anyone else. However, the doctor also testified that defendant may not have known it was wrong to lie to cover it up. It was not erroneous to allow Dr. Rood to narrowly confine her expert opinion. Therefore, defendant's argument is rejected.

## VIII.

[8] Defendant next maintains that the court committed reversible error in allowing Dr. Rood to testify about results of a test she did not personally perform. Defendant contends that the admission of this evidence was in violation of the hearsay rule. It is true that Dr. Rood relied upon certain tests administered by staff psychologists at Dorothea Dix Hospital. This testimony was properly admissible under an exception to the hearsay rule enunciated by this Court in *State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794 (1974) and *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979). These cases stand for the propositions that: (1) a physician, as an expert witness, may render his or her opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied to him or her by others, including the patient, if the information is inherently reliable even though it is not independently admissible into evidence; and (2) if the expert's opinion is admissible, the expert may testify to the information he or she relied upon in forming it for the purpose of showing the basis of the opinion. *Wade*, 296 N.C. at 462, 251 S.E. 2d at 412.[1] The *DeGregory* and *Wade* cases both involved hearsay information a psychiatrist utilized in formulating an expert opinion on the sanity of a defendant on trial for murder.

Under the rules contained within *DeGregory* and *Wade*, this testimony was properly admitted. Therefore, defendant's argument is rejected.

---

1. This rule has now been codified in the new Rules of Evidence at G.S. § 8C-1, Rule 803(4).

## IX.

[9] Defendant next argues that the trial court committed reversible error in denying defendant's request to charge the jury on the crime of voluntary manslaughter. During the charge conference, the trial judge explored with the prosecutor and defense counsel the possible verdicts to be presented to the jury. In the discussion, defense counsel Mr. Weeks stated that, "I think I agree with you Judge, there is no evidence of voluntary manslaughter." He then retracted this statement with the following explanation:

> MR. WEEKS: What I am trying to say is I think there should be on the question of the verdicts, manslaughter in the case, instead of what I just told you should be in the case.
>
> COURT: You are asking that I charge on both voluntary and involuntary manslaughter?
>
> MR. WEEKS: Yes, sir, on account of the nature of the case and her condition, which I am in a position to know.
>
> COURT: I'll be glad to hear from you on why you feel this would be a possible case of voluntary manslaughter.
>
> MR. WEEKS: *I'll be perfectly honest with Your Honor and tell you I think it is something the jury could compromise. The Courts have said many times whether there's evidence of it or not they can use a little mercy if they want to and compromise and the Supreme Court doesn't bother it.*

(Emphasis original.)

At the charge conference, defense counsel wanted the trial judge to submit the charge of voluntary manslaughter to the jury without any evidence to justify it in order to give the jury an offense upon which it could compromise. The trial judge correctly declined defense counsel's offer to permit this.

The defendant reasons that "[t]he jury was not bound to believe all or any portion of the testimony of the witness Gibbs. Indeed, we have seen in previous argument substantial reasons why her testimony is suspect." Without accepting Gibbs' testimony, she reasons, there was a basis to submit the voluntary manslaughter verdict to the jury because defendant testified that she had no intent to kill and did not kill her child.

The defendant's argument is based on faulty reasoning. The trial judge could not decide that Ms. Gibbs was unworthy of belief — nor can this Court. The credibility of Ms. Gibbs' testimony was a matter for the jury to evaluate. In determining whether sufficient evidence exists to take a case to the jury, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference that can be drawn from the evidence. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). Accordingly, we uphold the trial court's ruling on this motion.

X.

[10]  Defendant's next argument is that the trial judge committed error when he denied defendant's motion to set aside the verdict, since the jury returned its verdict fifteen minutes after it retired to deliberate. Defendant in her brief observes that there are no North Carolina cases in which the Court has addressed the question of whether the jury's deliberation for a brief period of time can be grounds for setting aside the verdict. However, the general rule applied in state and federal courts in criminal cases is that a jury is not required to deliberate for any particular period of time, and the mere fact that a jury deliberates for a short period of time is generally insufficient to indicate that the verdict was the result of passion, prejudice, or bias. 23A C.J.S. Criminal Law § 1368 (1961).

There is no dispositive case on this point in this State in the context of a criminal case. However, this Court decided this issue in the context of a civil case in *Urquhart v. Durham and South Carolina Railroad Co.*, 156 N.C. 581, 72 S.E. 630 (1911). This Court addressed this issue as follows:

> The last exception is that the jury did not remain out more than twenty minutes before bringing in their verdict. The case had doubtless been so fully, carefully, and indeed minutely, presented to their consideration in every aspect by the able counsel in the cause, both in presenting the testimony and in arguing the case, as well as by the lucid instructions of his Honor, that the jury doubtless thoroughly understood the points at issue and did not need more time. Of that they are usually the best judges. We know of no rule by which this Court can estimate the time, or lay down a

rule, as to how long a jury shall remain in consultation before bringing in their verdict. Of course, if there was misconduct on the part of the jury or a contemptuous or flippant disregard of their duties in considering a matter submitted to them, the trial judge is intrusted with the power and the duty to rebuke them and either send them back to reconsider the case or to set aside their verdict. But this is a matter which is left to his sound discretion, and cannot be intelligently reviewed by this Court.

*Id.* at 586, 72 S.E. at 632; *accord, Segars v. Atlantic Court Line Rail Road,* 286 F. 2d 767 (4th Cir. 1961) (wherein the Court concluded that there was no error when a verdict was returned in four minutes).

We conclude that shortness of time in deliberating a verdict in a criminal case, in and of itself, simply does not constitute grounds for setting aside a verdict. The brevity of deliberation should only be questioned if there is evidence of some misconduct on the part of the jury or the trial judge believes that the jury acted with a contemptuous or flagrant disregard of its duties in considering the matters submitted to it for decision. For these reasons, this assignment of error is also rejected.

## XI.

Finally, defendant argues that the trial judge committed error when he denied defendant's motions to set aside the verdict and to arrest judgment and also when he entered judgment in this case. By this assignment of error, defendant asserts that the verdict should be set aside and judgment arrested if this Court finds reversible error in any of the ten arguments previously set forth in her brief, or if the cumulative effect of a number of harmless errors adds up to prejudice necessitating a new trial in the interest of fundamental fairness. Because we have found that no reversible error was committed by the trial court in connection with defendant's trial and because there were no harmless errors considered cumulatively that prevented defendant from receiving a fair trial, this argument is likewise rejected.

Accordingly, defendant received a fair trial, free from prejudicial error.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.