STATE OF NORTH CAROLINA v. JERRY LYNN KING

No. 533A89

(Filed 13 June 1990)

1. **Criminal Law § 78 (NCI4th)— murder—pretrial publicity— change of venue denied**

The trial court did not abuse its discretion in a prosecution for murder, robbery and burglary by denying defendant's motion for change of venue for pretrial publicity where the evidence presented was not sufficient to establish pervasive word-of-mouth publicity, the media coverage was extensive but not excessive, and the articles were factual accounts of what took place. Furthermore, defendant did not request that jury selection be transcribed in order to be included in the record, the record does not reflect how many peremptory challenges defendant used, defendant did not make any showing that there were any problems in jury selection involving pretrial publicity, defendant therefore failed to carry his burden of establishing prejudice, and the trial judge satisfied himself that excessive publicity was not a problem before he impaneled the jury. N.C.G.S. § 15A-957.

**Am Jur. 2d, Criminal Law §§ 378, 688.**

2. **Criminal Law § 186 (NCI4th)— motion to prohibit jury dispersal—nothing in record to indicate hearing—presumed denied**

A motion to prohibit jury dispersal in a prosecution for murder, robbery, and burglary was in effect denied where nothing in the record indicates that the motion was ever heard. Absent evidence of waiver or withdrawal, proceeding with a trial without hearing a pretrial motion is in effect a denial of that motion. Assuming that the motion was in fact heard and denied, defendant failed to show actual prejudice.

**Am Jur 2d, Trial §§ 949-955.**

3. **Criminal Law § 98.2 (NCI3d)— murder—motion to sequester and segregate State's witnesses—not ruled upon**

There was no abuse of discretion in a prosecution for murder, robbery and burglary from the trial judge's failure to rule upon defendant's motion for sequestration and segregation of the State's witnesses where defendant contended that the motion was heard and denied by the trial judge, the record does not confirm that assertion, and defendant failed to demonstrate how the denial of the motion, if in fact it was heard and denied, actually and substantially prejudiced him.

**Am Jur 2d, Trial § 61.**

4. **Criminal Law § 169 (NCI3d)— murder—objection to defense questions sustained—no offer of proof**

The trial court did not err in a prosecution for murder, robbery, and burglary by sustaining the prosecutor's objection to a defense question concerning an offense the witness's cousin had allegedly been charged with where there was no offer of proof. The Court could only speculate as to what the witness's answer would have been and defendant failed to demonstrate how the trial court's ruling prejudiced his case.

**Am Jur 2d, Trial §§ 128-130.**

5. **Homicide § 21.5 (NCI3d)— first degree murder—motion to dismiss denied—no error**

The trial court did not err in a prosecution for first degree burglary, robbery with a deadly weapon, and first degree murder by denying defendant's motion to dismiss where defendant's admissions to his cell mates in conjunction with

physical evidence at the crime scene were sufficient to establish each element of the crimes charged. This Court has upheld numerous convictions obtained primarily on the basis of admissions made to prison cell mates and the argument that the cell mates were not reliable witnesses goes to the weight of the testimony, not to its sufficiency.

**Am Jur 2d, Evidence § 572.**

6. **Criminal Law § 420 (NCI4th) — prosecutor's closing argument — no objection — within permitted latitude**

The trial court in a prosecution for murder, robbery, and burglary did not err by failing to intervene *ex mero motu* in the prosecutor's closing argument where defendant failed to object to any portion of the argument and the argument was well within the wide latitude permitted in hotly contested cases.

**Am Jur 2d, Trial § 218.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Burroughs, J.,* at the 29 May 1989 Criminal Session of Superior Court, CATAWBA County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals on accompanying convictions was allowed on 5 December 1989. Heard in the Supreme Court 14 May 1990.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy and John H. Watters, Assistant Attorneys General, for the State.*

*Randy Meares for defendant-appellant.*

MEYER, Justice.

On 9 May 1988, defendant was indicted for first-degree burglary, robbery with a deadly weapon, and first-degree murder in the stabbing death of Nancy Brown Covington on 18 August 1986. The offenses were joined for trial on 28 April 1989, and the case was tried before a jury at the 29 May 1989 Criminal Session of Superior Court, Catawba County, Judge Robert M. Burroughs presiding. The jury found defendant guilty of first-degree murder on theories of premeditation and deliberation and of felony murder, guilty of first-degree burglary, and guilty of armed robbery. During

the sentencing phase, the jury found that the mitigating circumstances found were sufficient to outweigh the aggravating circumstances found and accordingly recommended a sentence of life imprisonment. The trial judge, following the jury's recommendation, sentenced defendant to life imprisonment for the murder and additionally sentenced defendant to life imprisonment for the burglary and forty years for the robbery, each sentence to run consecutively. On appeal, defendant brings forward six assignments of error. After a thorough review of the transcript, record, briefs, and oral arguments we conclude that defendant received a fair trial free of prejudicial error.

The State's evidence tended to show that the victim, Nancy Brown Covington, was a sixty-six-year-old black woman who lived in a mobile home in Hickory, North Carolina. Mrs. Covington lived alone, but every day her niece visited her to make sure she was all right. On Sunday, 17 August 1986, Mrs. Covington's niece checked on her around 7:00 p.m. The next morning, at approximately 6:15 a.m., she again stopped by the house, accompanied by Mrs. Covington's sister. The front door was locked, and the two were unable to get any response from inside; so they crawled into the house through a window next to the front door. They found Mrs. Covington's body lying on the floor of the master bedroom.

Robert Melton, a special agent of the State Bureau of Investigation, processed the crime scene. On the exterior of the residence, he noted an L-shaped cut in the south bedroom window screen. The sharp edges of the cut suggested that it had been done recently. A fifty-five-gallon barrel under the window appeared to have been moved recently. Upon examination of the window from the inside, Agent Melton noted that there was undisturbed dust and dirt on the bottom of the window frame; however, there was an area on the top of the frame where the dust and dirt had been wiped away. The agent observed pry marks on the rear door of the home and noted that the door's interior curtains were partially hanging outside of the door.

Inside the mobile home, nothing appeared disturbed with the exception of the victim's bedroom. Agent Melton found Mrs. Covington's body lying on her right side on the floor beside her bed. The bedroom had been ransacked, and various items had been placed on the bed, including a sewing kit, a small orange-handled screwdriver, a leather handgun holster, and various religious and

medical papers. Investigators discovered blood only in the bedroom and on a knife which was located under the kitchen sink. All of the blood was consistent with the victim's blood type.

Agent Melton took twenty-six latent print impressions from various areas of the home. The fingerprint examiner testified that, of those prints, only seven proved valuable for identification purposes. All seven prints belonged to the victim.

Another agent testified that two head hairs found on a pillow from the bed were consistent with samples from the victim and that of seven hairs found on the comforter, six hairs were consistent with the victim's hair and one was not consistent with either defendant or the victim. Hairs taken from the bottom bed sheet and from the victim's left hand were also consistent with the victim's head hair. An expert in fiber comparison testified that State's Exhibit 17, a taping from the south bedroom window, contained several black cotton fibers and one dark brown triacetate fiber. The expert testified that triacetate fibers are commonly found in women's lingerie items and in jacket linings. Cotton fibers are typically found in many types of clothing.

The pathologist who performed the autopsy testified that he observed thirty-five knife wounds on the victim's body, one of which severed her jugular vein. He further testified that he believed the time of death was in the early morning hours of 18 August 1986.

A neighbor, Gail Springs, testified that defendant came to her house around midnight on the night of the murder and borrowed a screwdriver, which he never returned.

Herbert Thompson testified for the State under a grant of immunity. He testified that on 18 August 1986, defendant woke him up at a friend's house around 3:00 a.m. and asked Thompson to take him to defendant's mother's house to obtain some items to trade for cocaine. Thompson drove defendant to his mother's house, which was located just a few yards in front of the victim's mobile home. Thompson parked in front of defendant's mother's residence and observed defendant as he went inside. Ten to fifteen minutes later, Thompson observed defendant come from around the side of his mother's residence carrying something under a black jacket. Defendant got into the car and told Thompson to keep the headlights off as he backed the car out of the driveway. The two drove to Larry Saunders' home, where Thompson let defendant

out of the car. About five minutes later, defendant joined Thompson and another acquaintance at a neighboring house, and the three of them "mainlined" the cocaine. Thompson took defendant to his brother's house at approximately 4:30 a.m.

The victim's niece testified that she had been raised by Mrs. Covington since the age of four, when her parents died. She knew the defendant had known the victim for fifteen years because he lived with his mother in a house just a few yards from the victim's home. She testified that defendant had been in the victim's home before. She further testified that Mrs. Covington kept much of her jewelry in a white jewelry box on top of her bedroom dresser. After the murder, the jewelry box was missing. She identified State's Exhibit 41 as being a ring just like one the victim owned and which the niece had been unable to locate after the murder. It was described by the prosecutor as a gold band with a pink star sapphire stone. Additionally, she testified that the victim owned a small handgun which she kept in a compartment at the head of her bed. After the murder, the gun was missing, but its leather holster was found on the bed. Finally, the niece testified that she did not recall pry marks found on the rear door being there prior to the murder.

Ronald Wilfong and Josephine Fredericks both identified State's Exhibit 41 as being a ring Wilfong had bought from defendant and had given to Fredericks.

Detective Steve Hunt of the Hickory Police Department testified that around 21 August 1986, defendant became a suspect in the Covington murder, and a warrant was issued charging him with the crime. Defendant learned of the existence of the warrant from his brother and voluntarily turned himself in to the authorities. He gave a statement to the police to the effect that he was with Thompson in the early morning hours of 18 August 1986 and that after leaving Thompson, he went to his mother's house, where he spent the rest of the night. He denied having borrowed a screwdriver from Gail Springs on the night of the murder, but he admitted that he was shooting up drugs and selling them. Defendant was arrested and placed in the Catawba County jail.

While in jail, defendant was housed with witnesses Robert Lowe, Charles Stokes, Douglas Silva, and Charles Littman. Lowe testified that sometime around November of 1986, he spoke with defendant and asked if "he [the defendant] was the one that they

were suspected [sic] in the murder investigation." Defendant responded affirmatively, adding, "they ain't got no evidence on me and I ain't saying nothing."

Stokes testified that defendant told him in September 1986 that he had "broke into this lady's house, or broke in somebody's house and he was on drugs, and . . . was wanting some money to get him some drugs with, and there was somebody in the house, and he said he killed her, stabbed her with a knife." Stokes further testified that defendant said that because the victim recognized him, he stabbed her so that she would not be able to identify him. On cross-examination, Stokes testified that defendant told him he got a "heater" from the victim. He assumed that defendant meant a portable household heater; however, he acknowledged that the term "heater" is also a slang term for a gun.

Silva testified that sometime after November 1986, he was playing cards with defendant and asked defendant how he could kill a seventy-year-old woman. Defendant replied that "he had [to], she would not let him rob her, she struggled, she ripped off his mask, she saw who he was so he had to do it." Defendant also told Silva he had stolen jewelry from the victim and felt that he would escape the charges because the police had someone else under investigation.

Littman testified that in the fall of 1986, he and defendant discussed the Covington murder, and defendant told him he had killed Mrs. Covington because he broke in, she knew him, and he had to kill her. Littman testified that defendant said he was using drugs at the time and traded what he had obtained from the victim to a drug dealer named Larry Saunders in exchange for cocaine.

Defendant presented no evidence at trial.

[1] In his first assignment of error, defendant contends that the trial court erred in failing to grant his motion for change of venue. In that motion, defendant stated in support of his position that "a feeling of racial injustice has been loudly voiced by several civic and religious leaders in the black community through the news media, wherein an atmosphere has been created that may influence a jury to convict the Defendant, not because of the evidence against him, but rather to ease racial tensions." A number of assaults on elderly black women had occurred in the weeks prior to the

murder of Nancy Covington, who was herself a sixty-six-year-old black woman who lived alone. Five months prior to her murder, another woman had been murdered under similar circumstances. The two murders and the other attacks which had taken place created a great deal of community concern. As a result, the media ran numerous stories about the ensuing investigations of the two murders, including the prosecution of a suspect in the earlier murder, a proceeding which ended in a mistrial. The State ultimately accepted a guilty plea from that defendant in exchange for a reduced charge of second-degree murder. The media also focused on the efforts being made to combat the area's perceived drug problem, which was assigned as the reason for the wave of assaults.

Once defendant was suspected by the authorities as being involved in the Covington murder, the media began to run stories naming defendant as the perpetrator of the crime. One story included a photograph which depicted defendant being escorted by police officers while in handcuffs and shackles.

Defendant contends that the totality of these circumstances indicates that the jury could not help but be exposed to negative prejudicial publicity about the case that would in turn taint their opinion of defendant. Defendant concludes that the trial judge therefore abused his discretion in failing to grant defendant's motion for change of venue. We disagree.

Judge Forrest A. Ferrell conducted a pretrial hearing on the motion on 12 August 1988. In support of the motion, defendant presented copies of the newspaper accounts which had covered the story. To prove excessive word-of-mouth publicity, defendant offered the testimony of Reverend Webster E. Lytle, pastor of the victim's church and a member of the Hickory City Council. Lytle testified that five or six members of the church's six-hundred-member congregation had expressed concern about the murder of the victim, who was a popular and involved member of the church. Lytle further testified, however, that none of these persons had formed an opinion as to defendant's guilt or innocence. There was no one, to Lytle's knowledge, who had formed a fixed opinion that defendant was the person responsible for the killing. Lytle also stated that he did not consider the newspaper accounts to be inflammatory. The victim's community was known as the Ridgeview area and, according to Lytle, has a population of approximately 3,000 persons. Lytle testified that approximately 26,000

people live within the corporate limits of the Town of Hickory and that Catawba County has a population of over 100,000.

At the conclusion of defendant's evidentiary showing, Judge Ferrell denied the motion, stating the following as his reasoning:

> I think you've established that there may be sufficient public interest in the case in the Hickory area and limited primarily to the Ridgeview community. This doesn't necessarily mean that there's been established a prejudice against the defendant but you've shown that there is at least an interest and justifiably so in that—in the nature of the articles you've presented to the Court. This doesn't, however, mean that there's been any . . . showing of prejudice against the defendant in the county at large, in the body of the county. Now, I can not conclude from your showing that such exists.

The trial judge went on to say that if pretrial publicity became a problem at any time during the course of the trial, defendant was free to reopen the venue issue or to request a special venire.

The relevant statute, N.C.G.S. § 15A-957, provides in part as follows:

> If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:
>
> (1) Transfer the proceeding to another county . . . , or
>
> (2) Order a special venire . . . .

N.C.G.S. § 15A-957 (1988).

A motion for change of venue or for a special venire from another county on grounds of the prominence of the victim and inflammatory publicity is addressed to the sound discretion of the trial judge, and the defendant must demonstrate an abuse of discretion before this Court will determine that the ruling was in error. *State v. Harrill*, 289 N.C. 186, 221 S.E.2d 325, *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1211 (1976). The burden of showing "so great a prejudice against the defendant that he cannot obtain a fair and impartial trial" falls on the defendant. *State v. Boykin*, 291 N.C. 264, 229 S.E.2d 914 (1976).

## STATE v. KING

[326 N.C. 662 (1990)]

We have analyzed the record in this case, particularly focusing our attention on Reverend Lytle's testimony and on the newspaper articles submitted for our review. Reverend Lytle's testimony that five or six persons in his congregation expressed concern was not sufficient evidence to establish pervasive word-of-mouth publicity. In. fact, Lytle went out of his way to express his opinion that he and each of the persons he had talked with had maintained an open mind about the defendant's involvement. While the media coverage of these murders was somewhat extensive, it was not excessive. The articles are factual accounts of the events that were taking place. We are not convinced that the evidence presented by defendant established a prejudice so great that he could not obtain a fair and impartial trial.

Furthermore, this Court has required that a defendant specifically identify prejudice among the jurors selected before he is entitled to a new trial based upon the failure of the trial court to grant a motion for change of venue. The defendant must demonstrate that it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information, either through the media or by word of mouth, rather than upon the evidence presented at trial, and would therefore be unable to remove from their minds any preconceived impressions they might have formed. *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). "[W]here a defendant does not show that he exhausted his peremptory challenges or that jurors had prior knowledge of the case, he fails to carry the burden of establishing prejudice." *State v. Harris*, 323 N.C. 112, 121, 371 S.E.2d 689, 695 (1988). In the case at bar, defendant did not request that jury selection be transcribed in order to be included in the record. The record does not reflect how many peremptory challenges defendant used. Defendant did not make any showing that there were any problems in jury selection involving pretrial publicity. Defendant has therefore failed to carry his burden of establishing prejudice.

We additionally note that the transcript reveals that the trial judge satisfied himself that excessive publicity was not a problem before he impaneled the jury. He informed counsel that he planned to ask the jurors "if anything has been in the media about the case," and posed this question to counsel. Defendant's attorney answered, "Just a very limited amount. And the Hickory Daily Record said the trial would start today." The trial judge then

asked the jury, "Anybody read anything or see anything or hear anything about this case since you'be [sic] been selected? All 15 of you." The transcript reveals that all of the jurors answered in the negative. We conclude that this assignment of error is without merit.

[2] Defendant next assigns error to the trial court's denial of his motion to prohibit jury dispersal, the text of which reads as follows:

NOW COMES the Defendant and moves the Court that the jurors in the above-styled case shall not be allowed to disperse but shall remain together throughout the proceedings in said case and shall not be allowed to communicate with anyone except the Court or the bailiffs, nor be allowed to read current newspapers concerning the trial and all such communications shall be reported to the attorney for the Defendant.

The State points out that there is nothing in the record to indicate that defendant's motion was ever heard and denied by the court and argues that the motion should therefore be deemed either waived or withdrawn. We agree. Absent evidence of waiver or withdrawal, proceeding with a trial without hearing a pretrial motion is, in effect, a denial of that motion. *State v. Freeman*, 280 N.C. 622, 187 S.E.2d 59 (1972).

Assuming *arguendo*, however, that the motion was in fact heard and denied, we note that a motion to prohibit jury dispersal is to be decided within the sound discretion of the trial judge and will not be disturbed absent abuse of that discretion. *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Defendant must show both that there was error in the denial of the motion and that he was prejudiced by that denial before he will be granted a new trial. *State v. Crandall*, 322 N.C. 487, 369 S.E.2d 579 (1988). In *State v. Stokes*, 308 N.C. 634, 304 S.E.2d 184 (1983), this Court held that the trial court did not abuse its discretion in denying the defendant's motions for individual voir dire in jury selection, for sequestration of the jury venire during voir dire proceedings, and for sequestration of the trial jury after selection was completed because of pretrial publicity concerning the defendant's case. This Court reasoned that defendant failed to produce any evidence tending to show the existence of inflammatory, nonfactual reporting by the news media or that any seated juror was affected by pretrial

publicity. The defendant's arguments were deemed to be speculative and unpersuasive. Such is the case here as well, as we have previously concluded herein.

We further note that the trial judge admonished the jurors during breaks in the proceedings that they were "to remember you're not to discuss the case with anyone; don't let anyone discuss the case with you; don't discuss the case among yourselves; keep an open mind. Decide the case based on the evidence that you hear from the witnesses." We conclude that defendant has failed to show actual prejudice that prevented him from receiving a fair and impartial trial.

[3] Defendant's third assignment of error concerns the trial court's failure to rule on defendant's motion for sequestration and segregation of the State's witnesses during trial. In that motion, defendant requested that the trial court enter an order sequestering all persons expected to be called by the State for the duration of the trial except during their actual testimony and that the court further enter an order to individually separate the witnesses. In support of the motion, defendant cited the "emotionally charged and prejudicial publicity" surrounding the case, his belief that the presence of an extensive number of witnesses for the State could have "an unduly persuasive effect upon the minds of the jurors," and his fear that collective gatherings of State's witnesses would lead to "the loss of individual recollection and the substitution of a 'mass' or 'consensus' recollection" when the witnesses were called to testify.

Again, defendant contends that the motion was heard and denied by the trial judge. The record does not confirm this assertion. We again apply the standard of abuse of discretion and find defendant's argument unpersuasive. He has failed to demonstrate how the denial of this motion, if in fact it was heard and denied, has actually and substantially prejudiced him.

[4] Next, defendant contends that the trial court erred in sustaining the prosecutor's objection to a defense question concerning an offense the witness' cousin had allegedly been charged with. The following exchange took place during defendant's cross-examination of the victim's niece:

Q Do you know a gentleman by the name of Michael Jeeter?

A Yes, I do.

Q How do you know Michael Jeeter?

A Well, Michael, he's my cousin. . . .

Q Do you know where Michael Jeeter was living on August the 18th, 1986?

A He was living right up the street from where my mother was living . . . .

Q . . . [A]bout how far was that from where Mrs. Covington lived?

A . . . [T]here's four apartments between his house and my mother's trailer.

. . . .

Q Do you know that Michael Jeeter has been charged—

[PROSECUTOR]: Objection.

THE COURT: Sustained.

Defendant contends that the adverse ruling by the trial court was an abuse of its discretion which resulted in undue prejudice to defendant. Again, defendant has failed to demonstrate how the trial court's ruling was improper and, specifically, how this ruling prejudiced his case. We can only speculate as to what the witness' answer would have been, since defendant did not tender an offer of proof. "[I]n order for a party to preserve for appellate review the exclusion of evidence, the significance of the excluded evidence must be made to appear in the record and a specific offer of proof is required unless the significance of the evidence is obvious from the record." *State v. Simpson*, 314 N.C. 359, 370, 334 S.E.2d 53, 60 (1985).

**[5]** Defendant next contends that the trial court erred in failing to grant his motion to dismiss. He contends that the State failed to carry its burden of presenting substantial evidence on each essential element of the charged offenses.

We have reviewed the transcripts, record, and briefs in this case, and while we concede that the physical evidence at the scene of the crime was, at best, inconclusive, we nevertheless conclude that the State presented more than sufficient evidence to allow this case to go to the jury. The evidence is to be considered in the light most favorable to the State, and the State is entitled

to every reasonable inference to be drawn from the evidence. *State v. Thomas*, 296 N.C. 236, 250 S.E.2d 204 (1978). Contradictions and discrepancies are for the jury to resolve, and all of the evidence actually admitted which is favorable to the State, whether competent or incompetent, is to be considered by the Court in ruling on a motion for dismissal. *Id.*

This Court has upheld numerous convictions obtained primarily on the basis of admissions made to prison cell mates. In *State v. Spangler*, 314 N.C. 374, 333 S.E.2d 722 (1985), the defendant was tried for murder of her ten-month-old son. The State's only evidence consisted of the physical injuries to the child and the testimony of a fellow prison inmate who stated that the defendant had told her that she killed her child by hitting the child's head on the side of a bathtub. This Court held that "[i]f the jury chose to believe [the inmate witness], this alone could be sufficient evidence of malice, premeditation, and deliberation." *Id.* at 383, 333 S.E.2d at 728.

Evidence of corpus delicti coupled with the testimony of a cell mate relating inculpatory statements made by the defendant is sufficient to support a conviction. In this case, defendant's statements to his cell mates constitute admissions. An admission is a statement of pertinent facts which, in light of other evidence, is incriminating. 2 Brandis on North Carolina Evidence § 82 (1982). Here, defendant told Robert Lowe, "they ain't got no evidence on me and I ain't saying nothing." He told Charles Stokes that he had "broke[n] into this lady's house" because he wanted to obtain some money with which to purchase drugs and that he had stabbed her with a knife because she recognized him. He stated that he killed her so that she would not be able to identify him. When Douglas Silva asked defendant how he could kill a seventy-year-old woman, defendant replied that he had to because she would not let him rob her. He told Silva that he had stolen jewelry from the victim. Charles Littman corroborated Herbert Thompson's testimony that defendant obtained his cocaine that night from a drug dealer named Larry Saunders.

Defendant's argument that the cell mates were not reliable witnesses goes to the weight of the testimony, not to its sufficiency. The jury was properly permitted to weigh the evidence presented. Defendant's admissions to his cell mates, in conjunction with the physical evidence at the crime scene, were sufficient to establish

each element of the crimes charged, thereby justifying submission of the charges to the jury.

**[6]** Finally, defendant assigns error to the trial court's failure to intervene *ex mero motu* in the prosecutor's closing argument. Without being specific, defendant contends that the argument contained numerous statements that were not in evidence and that would appear to be the prosecutor's subjective feelings about the case. Defendant failed to object to any portion of the argument. Therefore, in our review, the alleged impropriety must be grossly egregious in order for this Court to determine that the trial court erred in failing to take corrective action on its own motion. *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984). We conclude, after reviewing the transcript, that the prosecutor's closing argument was well within the wide latitude permitted in hotly contested cases, and accordingly, we overrule this assignment of error.

We have conducted a thorough review of the assignments of error presented and conclude, for the reasons stated above, that defendant received a fair trial free of prejudicial error.

No error.